*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FS-73

IN RE: PETITION OF S.L.G & S.E.G.;
D.A., APPELLANT

Appeal from the Superior Court
of the District of Columbia
(A-105-12)

(Hon. Tara Fentress, Magistrate Judge;
Hon. Maribeth Raffinan, Reviewing Judge)

(Submitted October 30, 2014                     Decided March 5, 2015)

*Jon S. Pascale* was on the brief for appellant D.A.

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Aisha Lewis*, Assistant Attorney General, were on the brief for appellee District of Columbia.

*Sharon A. Singh* was on the brief for appellees S.L.G and S.E.G.

*Ronald Woodman*, guardian ad litem for appellee A.A., filed a statement in lieu of brief opposing the appeal and supporting appellees S.L.G. and S.E.G.

Before GLICKMAN and BECKWITH, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* GLICKMAN.

Concurring opinion by *Senior Judge* NEWMAN at page 31.

GLICKMAN, *Associate Judge*: D.A. appeals the decision of the Superior Court waiving her consent to the adoption of her daughter A.A. by appellees S.L.G. and S.E.G.[1] She primarily contends that the Superior Court erred by basing its decision, improperly, on a direct comparison of her with the adoption petitioners, and by failing to consider the likelihood that she would become a fit parent for A.A. within the foreseeable future. We conclude that although there is ample evidentiary support in the record for the trial court's ruling, the court did not make the necessary predicate determinations relating to appellant's fitness *vel non* to parent A.A. herself. We therefore find it necessary to remand for further proceedings to rectify this deficiency.

**I.**

**A.**

On November 4, 2010, when A.A. was just over ten months old, she was brought to Children's National Medical Center with a skull fracture and subdural bleeding. Appellant could not satisfactorily explain how A.A. received these

---

[1] Appellant also asks this court to reopen the case in which A.A. was found to be neglected and placed in foster care with S.L.G. and S.E.G., but as she presents no argument on this request, we treat it as abandoned. *See Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001).

injuries, and the Child and Family Services Agency (CFSA) removed the child from appellant's care. A neglect proceeding was begun in Superior Court, and on December 8, 2010, appellant stipulated that A.A. was a neglected child. The court committed A.A. to the custody of CFSA, which placed her in foster care with S.L.G. and S.E.G.

At the disposition hearing, the court set the permanency goal as reunification of A.A. with appellant. To that end, the court directed appellant to participate in an Addiction Prevention and Recovery Assessment (APRA) and weekly drug testing, to attend parenting classes, and to receive psychological and psychiatric evaluations and individual therapy. All these services were made available to her. However, some sixteen months later, on April 24, 2012, the court changed the permanency goal from reunification to adoption in light of appellant's failure to comply with the court-ordered drug testing and therapy, among other problems. In the wake of that goal change, S.E.G. and S.L.G petitioned to adopt A.A. The child's biological father consented to the adoption, but appellant did not.

Magistrate Judge Fentress presided over a four-day evidentiary hearing on whether to waive appellant's consent and approve the adoption petition. At its conclusion, the magistrate judge, ruling from the bench, found it to be in A.A.'s

best interest to do so. The magistrate judge later issued written findings, conclusions of law, and an order to the same effect. Associate Judge Raffinan affirmed the magistrate judge's decision on appellant's motion for review. Whence comes this appeal.

**B.**

At the hearing, the magistrate judge heard testimony from several witnesses in addition to the parties, the most important of whom proved to be A.A.'s social worker and a psychologist who had evaluated appellant.

Marie Cohen was the social worker assigned to the case by the Board of Child Care (BCC), the organization that ran the foster care program in which A.A. was placed. Cohen testified about her experience with appellant, A.A., and the foster parents, including her efforts to help appellant comply with the court's directives and be reunified with A.A.[2] As Cohen recounted, she spent considerable

---

[2] Cohen also testified about her unsuccessful efforts to find a suitable placement for A.A. with a family member or other person proposed by appellant. As appellant does not claim these efforts were deficient, we need not describe them in this opinion, beyond noting that Cohen found some of appellant's suggestions to be troublingly inappropriate. At different times, for example, appellant asked Cohen herself to co-parent A.A. with her; asked another BCC staff member to adopt A.A.; and recommended a man who (Cohen learned) had an alcohol abuse

*(continued…)*

time explaining to appellant what she needed to accomplish, made lists with her to help her stay on track, and checked on her progress. Cohen also supervised appellant's visits with A.A. and made referrals for appellant to receive psychiatric and psychological evaluations and therapy and to attend parenting class. To assist appellant with transportation for these services and her visits with A.A., BCC provided appellant with $20 to $40 per week. It continued to provide this funding even though appellant repeatedly failed to document her expenses or participate as she was asked to do. Despite the financial and other assistance she received, appellant's visits with A.A. and her compliance with the court's order were erratic at best. Although she attended the parenting class and received the APRA and mental health evaluations, appellant did not follow through with their recommendations or comply with the court-ordered drug testing and therapy. In addition, she displayed a variety of behaviors that raised concerns about her mental health and her ability to care for a child.

Appellant's visits with A.A. were a chief area of concern. Cohen began overseeing appellant's weekly visitation with A.A. in November 2010. She

---

*(continued…)*
problem and, on one occasion, had appeared naked outside appellant's door, banging on it and demanding sex.

testified that from then until December 2011, appellant attended only 65% of her scheduled visits, often cancelling on the morning of the day the visit was to occur. After December 2011, and until the court hearing (which commenced in November 2012), there was modest improvement, but only to the extent that appellant made 77% of her scheduled visits. Appellant often was late when she did visit A.A. To make up for her latenesses, BCC allowed appellant to have extra time with A.A.[3] In addition, the agency twice changed the location of the visits at appellant's request to make it easier for her to get to them.[4]

Cohen testified that appellant's interactions with A.A. during the visits usually were appropriate. Appellant brought toys, books, and food for A.A. and read stories to her, and the child seemed happy to see her "mommy" and sad when the visits ended. However, appellant's behavior was sometimes worrisome. She often brought other people with her, including different men with whom she appeared to be in a relationship. She referred to two of these men as "daddy" in

[3] The magistrate judge noted that "the agency [BCC] went out of its way … to accommodate [appellant], especially with respect to visits."

[4] At one point, claiming she was afraid of A.A.'s father, S.J., because he had abused her, appellant asked Cohen to permit her and S.J. to visit A.A. separately. Cohen made arrangements to accommodate this request. Yet the following week, appellant and S.J. came to visit A.A. together.

front of A.A., though neither one was A.A.'s natural father. On one of these occasions, appellant locked herself, A.A., and her male companion in the bathroom for fifteen minutes and insisted that A.A. be transported to the emergency room because she professed to believe the child had been sexually abused while in the care of her foster family. A.A. was not wearing any clothes when appellant locked the bathroom door. The police were called and were able to convince appellant to open the door. On another occasion, appellant again insisted that A.A. had been sexually abused. After each of these incidents, A.A. was seen by a physician, who found no evidence of sexual abuse. The child did have a diaper rash.

While A.A. was in foster care, she was identified as having a developmental speech delay and began seeing a speech therapist. Cohen encouraged appellant to attend the sessions and provided her with financial assistance to do so. Appellant failed to attend them, however, and did not interest herself in A.A.'s progress.

As the magistrate judge noted in her oral findings, another "one of the most serious concerns in this case" was appellant's use of cocaine and her failure to comply with drug testing. Appellant tested positive for cocaine when the testing began in November 2010. Over the next year and a half, she consistently failed to report for testing or, when she did report, she failed to produce a urine sample that

could be tested.[5] Appellant did not provide a testable sample at all between July 5, 2011, and January 6, 2012, or between January 27, 2012, and May 25, 2012. Although she did test negative for cocaine on a few occasions, she also tested positive for cocaine as late as January 2012. It was not until July 2012 (after the permanency goal had been changed to adoption and just a few months before the hearing) that appellant started showing consistently negative drug test results.

Relatedly, appellant failed to pursue recommended drug treatment. Her APRA assessment in early 2011 had resulted in the recommendation that she enter a 12-step recovery program, and later a therapist recommended that she attend a substance abuse support group. But while appellant attended some meetings, she did not consistently hand in attendance forms to Cohen. Appellant never provided documentation to show that she had completed any drug treatment program.

Dr. Seth King, who had performed appellant's psychological evaluation, diagnosed her as having a mood disorder, not otherwise specified, and ADHD, in addition to her abuse of cocaine. Dr. King also believed that appellant needed to

---

[5] Appellant said she was unable to produce a urine sample because of a "shy bladder." She was prescribed a medication for this condition in May 2012. The magistrate judge noted that this was "long after" appellant was ordered to begin drug testing.

be evaluated further for bipolar disorder in light of a number of symptoms she displayed, including her high energy, rapid speech, grandiosity, depression, anxiety, irritability, and a pattern of getting involved in many different jobs and projects but never finishing them. Nonetheless, appellant failed to follow through on the mental health therapy that was recommended and that she had been ordered by the court to pursue.

In early 2011, appellant assured Cohen that she was receiving therapy through an organization called Washington Empowered Against Violence. Upon investigation, Cohen confirmed that this was not true. Accordingly, though appellant denied needing therapy, Cohen helped her make arrangements to receive it at the Hillcrest Children and Family Center. Appellant began attending therapy sessions at Hillcrest in April 2011, but she stopped after a few months. She never provided Cohen with documentation that she had been discharged from therapy. At trial, appellant identified Crystal Hill, a community support worker at Hillcrest, as her therapist. However, Hill testified that she is not a therapist and had not done any therapy with appellant.

Appellant gave Cohen a variety of medical excuses for missing her visits with A.A. and for not attending therapy sessions, but she never provided medical

documentation of them. She also cancelled visits for work-related reasons. At the hearing, appellant claimed to have been employed in various jobs, including as a driver, a nurse's aide, and a receptionist. However, though Cohen had requested appellant to furnish proof of employment, she never did so. Furthermore, she did not provide financial support for A.A.

In the opinion of Dr. King, appellant's mental health and behavioral issues raised serious concerns about her ability to care for A.A. and ensure her safety. Dr. King was concerned, for example, by appellant's expressed perception that there was no justification for the removal of A.A. from her care; by her history of exposing A.A. to inappropriate people and her evident dependence on men, which introduced dangerous and negative elements into her life and exposed her to domestic violence; by her indecisiveness and her poor compliance with therapy and treatment; by her recent history of drug abuse and the high likelihood of a relapse given the short period of time she had been testing negative; and by appellant's inability to remain organized and focused on A.A.'s needs, to exercise good judgment, to provide consistency in parenting, and to model good behavior for A.A. Noting the "higher demands associated with caring for a young child," Dr. King perceived appellant as being "susceptible to becoming overwhelmed [and] experiencing an intensification of symptoms of anxiety and mania," resulting

in poor decision making and parenting practices that "could lead to unsafe conditions and the neglect of her daughter."

Furthermore, in Dr. King's view, appellant's continuing resistance to engaging in therapy boded poorly for her capacity to gain the insight and make the changes in behavior necessary to avoid exposing A.A. to those risks in the foreseeable future. In order for reunification even to be considered, Dr. King opined, appellant would need to demonstrate the ability to focus on A.A.'s developmental needs and to comply with court-ordered services, including in-home mental health services to monitor her parenting practices for at least a year. Dr. King thought it unlikely that appellant would accomplish these things or become fit to parent A.A. in the foreseeable future.

The magistrate judge also heard testimony about the adoption petitioners and A.A.'s adjustment to her foster family. At the time of trial, A.A. had been with S.E.G. and S.L.G. and their family for two years.[6] She called them "mommy" and

---

[6] S.E.G. and S.L.G. had been married for twenty-six years. S.E.G. had been a prekindergarten teacher for twenty-six years. Her husband S.L.G. is a retired IRS senior budget analyst. They reside in a six-bedroom, single-family home with A.A. and their four biological children (three adult sons and one twelve-year-old daughter).

"daddy," and it was Cohen's observation, seconded by the foster parents themselves, that she was very happy in their home. A.A. also had bonded with S.E.G.'s mother, whom she called "grandma," and the couple's twelve-year-old daughter. The two girls shared a room, and the daughter enjoyed teaching A.A. her colors, letters, numbers, and shapes. A.A. attended church and Sunday school with the family, and they went to the library, park, and Chuck-E-Cheese together. S.E.G. and S.L.G. provided for A.A. financially, buying her clothes, shoes, coats, and other items. S.E.G. took A.A. to all her routine medical appointments and her appointments with the speech therapist. The family worked diligently with A.A. to improve her speech by reading to her and modeling correct speech, and was otherwise attentive to her needs. At the time of trial, A.A. no longer exhibited any developmental delays.[7]

In rendering her decision orally and in writing, the magistrate judge recited the evidence adduced at the hearing in considerable detail. It is clear that the magistrate judge credited the testimony of Cohen and Dr. King in particular and—focusing on the statutory factors that must be considered in determining whether to terminate parental rights—found, *inter alia*, that appellant's inconsistent and

---

[7] The guardian ad litem for A.A. informed the court that he supported the petition for adoption as being in A.A.'s best interest.

erratic behavior had "negative implications" for her capacity to provide a stable home for her daughter, and that appellant's unresolved mental health issues raised "concerns" as to her ability to care for A.A.[8] However, while she identified these issues, the magistrate judge made no express finding that appellant was not fit to parent A.A. or that preservation of the parent-child relationship would endanger or be detrimental to A.A. Nor did she acknowledge explicitly the presumption in our law favoring maintenance of a child's relationship with a parent who is fit.

Regarding the proposed adoption, the magistrate judge found, *inter alia*, that S.L.G. and S.E.G. were meeting and would continue to meet A.A.'s need for continuity of care and timely integration into a stable and permanent home,[9] that they had developed a close, happy, and loving relationship with A.A., and that the child's health and wellbeing had improved in their care.

---

[8] The magistrate judge also perceived that the quality of appellant's relationship with A.A. had been diminished by appellant's spotty visitation record and her failure to comply with court-ordered services meant to facilitate their reunification; and that "serious concerns" were raised by appellant's recent past use of cocaine and her failure to comply with treatment and regular drug testing.

[9] *See, e.g.*, *In re D.H.*, 917 A.2d 112, 118 (D.C. 2007) ("Timely integration into a stable and permanent home is arguably the most important factor when considering the best interests of the child."); *In re F.W.*, 870 A.2d 82, 86 (D.C. 2005) ("A stable and desired environment of long standing should not be set aside" when the children have lived with the prospective adoptive parents for most of their lives.) (internal citation omitted).

After thus reviewing the salient evidence, the magistrate judge stated her conclusions as follows:

> The Court, having weighed the relevant factors and considered the respondent's best interest, finds by clear and convincing evidence, that the mother is withholding her consent to the adoption, contrary to the respondent's best interest. The petitioners are fit, able, and willing caretakers and the child is thriving in their care. The social worker and GAL support the adoption.
>
> Adoption by the petitioners is in the respondent's best interest; accordingly, the biological mother's consent is waived.

On review the associate judge, finding that the magistrate judge did not abuse her discretion or make any error of law or erroneous factual finding, affirmed that determination. Like the magistrate judge, the associate judge did not address explicitly the question of appellant's fitness or the presumption in favor of a fit natural parent.

## II.

Appellant challenges the waiver of her consent on two main grounds. First, she contends that the decision to waive her consent to the adoption of A.A. was based on an improper "direct comparison of the natural parent and the foster

home"[10] rather than a proper consideration of the relevant factors. Second, appellant argues that the trial court failed to give adequate consideration to the possibility that she "might become a suitable parent in the foreseeable future."[11] For the reasons that follow, we conclude that a remand is necessary to clarify these matters in light of the absence of express findings by the trial court as to appellant's fitness to parent A.A. and the applicability of the presumption in favor of a fit natural parent.[12]

---

[10] *In re C.O.W.*, 519 A.2d 711, 714 (D.C. 1987).

[11] *In re C.T.*, 724 A.2d 590, 597 (D.C. 1999).

[12] Appellant also complains that the decision was made without an expert psychiatric or psychological evaluation of A.A.'s bond or attachment with her or with the adoption petitioners. Instead, the magistrate judge relied on the testimony of Cohen, appellant, S.E.G., and other witnesses who had first-hand knowledge of A.A.'s relationships with the parties. This was not improper, however. Given the importance of a healthy attachment to the psychological wellbeing of a child, expert testimony on attachment is relevant and often quite helpful to the court in making a determination in cases like this. *See, e.g.*, *In re T.W.M.*, 18 A.3d 815, 821 (D.C. 2011) (trial court relied in part on expert testimony that removing the child from the foster parent would have "devastating consequences"); *In re K.D.*, 26 A.3d 772, 776-77 (D.C. 2011) (trial court heard testimony from clinical psychologist who performed a bonding study). However, neither the statute nor the case law requires such testimony in every case, and its absence here does not, by itself, undermine the trial court's determination.

**A.**

We review a trial court's determination in a proceeding to terminate parental rights (TPR) and waive a natural parent's consent to adoption for abuse of discretion.[13] "In reviewing for an abuse of discretion, our task is to ensure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor."[14] The trial court's decision must be "supported by substantial reasoning drawn from a firm factual foundation in the record."[15]

As a procedural matter, we now are reviewing the order of the associate judge, who reviewed the magistrate judge's order in this case for errors of law, abuse of discretion, or clear lack of evidentiary support. But as we have said, "our powers of appellate review are [not] so limited that, in reviewing the [associate judge's] final order we may not look to the findings and conclusions of the fact

---

[13] *In re D.R.M.*, 570 A.2d 796, 803 (D.C. 1990).

[14] *Id*. at 803-804 (internal citation omitted).

[15] *In re J.C.F.*, 73 A.3d 1007, 1012 (D.C. 2013) (citing *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012)).

finder on which that ruling is based."[16]  Rather, "we review the magistrate judge's factual findings as the findings of the trial judge and review for abuse of discretion or a clear lack of evidentiary support.  As to alleged errors of law, however, we review the record *de novo,* without deference to the judges below."[17]

**B.**

A court may grant an adoption petition without the consent of a natural parent if it finds by clear and convincing evidence that the consent is being withheld contrary to the best interest of the child.[18]  Because granting an adoption over a natural parent's objection necessarily terminates the parent's rights, the court must weigh the same statutory factors that are considered in a TPR proceeding to decide whether termination is in the child's best interest.[19]  The statutory TPR factors relevant to this case are:

---

[16] *In re C.L.O*, 41 A.3d at 510.

[17] *Id.* (internal quotation marks and footnotes omitted).

[18] D.C. Code § 16-304 (e) (2012 Repl.).

[19] D.C. Code § 16-2353 (b) (2012 Repl.); *In re P.S.*, 797 A.2d 1219, 1223 (D.C. 2001).

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the difference in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; …

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and service have been provided …. [20]

Although "the paramount consideration" in determining whether to terminate parental rights is the best interest of the child,[21] our case law recognizes that the TPR factors must be applied in accordance with "the presumption that the child's best interest will be served by placing the child with his natural parent,

---

[20] D.C. Code § 16-2353 (b).  A sixth statutory factor, not at issue in this case, is whether the child was abandoned at the hospital following his or her birth.  *See id.* § 16-2353 (b)(3A).

[21] *In re S.M.*, 985 A.2d 413, 416 (D.C. 2009).

provided the parent has not been proven unfit."[22] This presumption in favor of the natural parent is a strong one that reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children.[23] While the presumption "is not absolute" and "must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent,"[24] the question of parental fitness

---

[22] *Id.* at 417.

[23] *See Troxel v. Granville*, 530 U.S. 57, 65-66, 68-69 (2000) ("[T]here is a presumption that fit parents act in the best interests of their children…. Accordingly, so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

[24] *In re S.M.*, 985 A.2d at 417; *see also, e.g.*, *In re J.G.*, 831 A.2d 992, 1001 (D.C. 2003) ("Notwithstanding the presumption in favor of the birth parent,... we have repeatedly held that the parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child."); *In re Baby Boy C.*, 630 A.2d 670, 682 (D.C. 1993) ("Thus,... a finding of parental unfitness is not a constitutional prerequisite to granting an adoption petition notwithstanding lack of parental consent."); *Appeal of H.R. (In re Baby Boy C.)*, 581 A.2d 1141, 1176-79 (D.C. 1990) ("[A] fit parent must prevail over a prospective adoptive family unless clear and convincing evidence demonstrates that the natural parent's custody would be detrimental to the best interests of the child.... [T[he assumption that a natural parent's fitness incorporates the child's best interests may be suspect on occasion. There conceivably can be circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child.... [T]he most obvious, and possibly the only, basis for denying custody to a

*(continued…)*

is almost always at the heart of any proceeding to terminate parental rights or waive a natural parent's consent to adoption. As the Maryland Court of Appeals has expressed it, the presumption in favor of the natural parent in a TPR or contested adoption proceeding is "rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest."[25]

Parental "fitness" is not a statutorily defined term in this jurisdiction, nor do the statutory TPR factors refer to "fitness" as an explicit criterion. Broadly speaking, though, fitness refers to the parent's intention and ability over time to

---

*(continued…)*
fit parent in the best interests of the child would be a finding based on clear and convincing evidence that parental custody would actually harm the child.") (Ferren, J., concurring).

[25] *In re Rashawn H.*, 937 A.2d 177, 190 (Md. 2007). In Maryland, as in the District of Columbia, the best interest of the child standard remains "the overriding statutory criterion in TPR cases," and that standard is applied with the strong but rebuttable "implicit substantive presumption that the interest of the child is best served by maintaining the parental relationship." *Id.* at 189-90; *see also In re Jayden G.*, 70 A.3d 276, 286 (Md. 2013) ("[T]he focus of the inquiry [in contested adoption and TPR cases] into the child's best interest—even with the parental presumption in place—must be on the child, not the parent."). Thus, decisions of the Maryland Court of Appeals in this area may be instructive as we interpret the requirements of our own statutory framework.

provide for a child's wellbeing and meet the child's needs.[26] The question of fitness turns, in other words, on "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare."[27] The same statutory factors that guide the court's determination of a child's best interest in a TPR or contested adoption proceeding therefore also guide the court's assessment in that proceeding of the natural parent's fitness *vel non*. The TPR factors do so by identifying, and focusing the court's exercise of discretion on, the fundamental determinants of a child's wellbeing.[28]

---

[26] We have recognized that parental fitness is determined by reference to the specific child whose placement is in issue. "An individual may be a fit parent for one child but not for another." *In re L.W.*, 613 A.2d 350, 360 n.24 (D.C. 1992).

[27] *In re Rashawn H.*, 937 A.2d at 191.

[28] *See In re K.A.*, 484 A.2d 992, 998 (D.C. 1984) ("[A] straightforward reading of § 16-2353 (b) reveals that a concern over the natural parents' unfitness inheres in this analysis. Continuity of care, stability and permanence of home environment, physical, mental and emotional health, interactions and relationships, and the child's judgment on the ultimate question all focus on fitness."); *see also Appeal of H.R.*, 581 A.2d at 1178 (explaining that the TPR factors, "as applied to the natural parent ... are of central concern" in evaluating the meaning of parental "fitness") (Ferren, J., concurring); *In re Jayden G.*, 70 A.3d at 303 n.32 ("[P]arental fitness, exceptional circumstances, and the child's best interests considerations are not different and separate analyses. The three concepts are fused together, culminating in the ultimate conclusion of whether terminating parental rights is in a given child's best interests.") (internal quotation marks and citation omitted).

So, for example, if the natural parent is unable or unwilling to meet the child's critical needs or maintain an appropriate parental relationship with the child, or if placement of the child with the natural parent would endanger the child or be detrimental to the child's wellbeing, that would mean the parent is unfit to care for that child. Conversely, if the natural parent is able and motivated to meet the child's fundamental needs and appropriately parent the child (or likely will be able to do so without undue delay because any parental disability has a reasonably close endpoint in sight), and placement with the parent would not otherwise be harmful to the child's welfare, then the TPR factors weigh in favor of finding the parent fit and applying the presumption. Accordingly, while "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State,"[29] a natural parent's unfitness may be evidenced by a variety of behaviors, conditions, and circumstances, including but not limited to past or ongoing child abuse, neglect, maltreatment, or abandonment; a failure to maintain contact with, nurture, or support the child; involvement in criminal or other activities that are seriously inimical to a child's welfare; the inability or unwillingness to make reasonable efforts to correct the

---

[29] *Santosky v. Kramer*, 455 U.S. 745, 754 (1982).

behaviors or conditions that led to the child's removal from the parent's custody, to provide a safe and stable home for the child, or to meet a particular child's special needs; chronic drug or alcohol abuse; and mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm.[30] This, of course, is not intended to be an exhaustive list.

Consistent with the foregoing principles, this court has admonished that a termination of a natural parent's rights may not be based on a direct comparison of the natural parent with the adoption petitioners.[31] Rather, "[a]ll persons involved with the child are to be considered in relationship to the best interests of the child, not in comparison to one another."[32] The child's relationship with the adoption petitioners may have a bearing on the TPR decision; for example, if disrupting the child's relationship with the adoption petitioners and returning the child to the

---

[30] *See generally* Joan H. Hollinger, *Adoption Law and Practice* § 4.04[1] (Matthew Bender 2014); *see also In re D.S.*, 88 A.3d 678, 689 n.15 (D.C. 2014).

[31] *See, e.g.*, *In re J.G.*, 831 A.2d 992, 1000 (D.C. 2003) (reiterating that "in no case may a contest between parent and nonparent resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child.") (internal quotation marks, brackets and ellipses omitted).

[32] *In re C.O.W.*, 519 A.2d at 713-14.

natural parent would be seriously detrimental to the child's wellbeing,[33] or if terminating even an unfit natural parent's rights would be contrary to the child's best interest.[34]  But this must not obscure the need for a threshold determination regarding the parental presumption.  "[T]he court's inquiry is not to determine whether the adoption petitioners would be better parents, or would provide a better home," than the natural parent; the natural parent's constitutionally protected interest in raising his or her children "may be overridden only if there is clear and convincing evidence presented that continuing the parent-child relationship would be contrary to the best interests of the children, and not merely that the adoption

---

[33] *See, e.g.*, *In re J.G.*, 831 A.2d at 1002 ("[W]here, as in this case, a small child has spent almost his entire life in the care of the prospective adoptive parent, and where his contact with his birth mother has been quite limited, it may be damaging to the child's welfare to extract him from the only home he has ever known.").

[34]  *See In re C.O.W.*, 519 A.2d at 714 (concluding that "insofar as the child's relationships with persons other than the natural parent are important in determining whether termination is required and if so, what its effects might be, statutory consideration of such relationships is constitutional"); *see also In re C.T.*, 724 A.2d 590, 598 n.9 (D.C. 1999) ("[I]n determining whether the drastic measure of terminating parental rights is required in the child's best interest, the court must consider the adoptive prospects of the child along with other relevant factors."); *In re Jayden G.*, 70 A.3d at 301-02 ("A finding of parental unfitness overcomes the parental presumption, but it does not establish that termination of parental rights is in the child's best interest.  To decide whether it is, the court must still consider the statutory factors[.]").

would be more beneficial to their interests."[35]  A court "cannot constitutionally use the 'best interests' standard to terminate the parental rights of a 'fit' natural [parent] ... and, instead, grant an adoption in favor of strangers simply because they are 'fitter.'"[36]

From all we have said thus far, it should be clear that it is incumbent on the trial court, in determining whether to waive the natural parent's consent to a proposed adoption,

> to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how.  If the court does that—*articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis

---

[35] *In re J.L.*, 884 A.2d 1072, 1077 (D.C. 2005).  "Parental rights, therefore, may not be terminated solely because of poverty, ill-health, or lack of education or sophistication, but only upon a high showing that such a drastic measure is necessary in order to protect the best interests of the child."  *Id.* (internal quotation marks omitted).  *See also* footnote 24, *supra*.

[36] *Appeal of H.R.*, 581 A.2d at 1178 (Ferren, J., concurring).

for terminating those rights are in proper and harmonious balance.[37]

The trial court does not fulfill its responsibility to make express, specific, and well-reasoned findings merely by reciting the evidence adduced at the hearing, cursorily "considering it" with respect to each TPR factor, and then rendering a conclusory, "totality-of-the-circumstances" determination that parental consent should be waived in the child's best interest. This is not enough to show that the court is applying the law correctly and respecting the presumption in favor of maintaining the parental rights of a fit natural parent.[38] Similarly, "proper recognition of the parental presumption requires more than a verbal allowance that the presumption

---

[37] *Rashawn H.*, 937 A.2d at 192 (emphasis in the original); *see also In re C.L.O.*, 41 A.3d 502, 511 (D.C. 2012) ("The court therefore begins by recognizing the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit.") (internal quotation marks omitted). We add that because the statutory TPR factors also are relevant in deciding whether an adoption petition should be granted, the court must render comparable findings and conclusions with respect to placement of the child with the adoption petitioners. *Cf.* D.C. Code § 16-309 (b) (2012 Repl.) (criteria for granting adoption petition include the fitness of the adoption petitioner and the best interests of the prospective adoptee).

[38] *Cf. In re J.F.*, 615 A.2d 594, 598 (D.C. 1992) (explaining that where the trial judge in a child neglect proceeding did not "acknowledge, much less address, the presumption in favor of a fit parent" in its custody determination, "[t]he judge's statement that she did not need to decide the rights of the adult parties, since the best interests of the child was the issue, fail[ed] to recognize the constitutionally protected interest at stake").

exists."[39]   The court must correctly and explicitly "incorporate the parental presumption into its analysis."[40]  If we have not made this requirement clear in our prior TPR and contested adoption cases (as we have done in our neglect cases where custody is at issue[41]), we do so now.

We do not mean to suggest that a mere failure to use the particular terminology of "fitness" is necessarily fatal by itself.  The omission of an explicit statement that a natural parent is "unfit" may be of no moment if there are equivalent findings, supported by the evidence, that the parent lacks the capacity or motivation to meet the child's needs or protect the child from harm.  While ambiguity may be avoided and our appellate review is greatly facilitated when the trial court has made an explicit finding of fitness or the lack thereof, "fitness" is simply a shorthand term of art, not a term of talismanic significance.  But if the trial court's findings and conclusions are materially deficient in this or other key respects, this court may conclude that "a remand is required to apply the best

---

[39] *In re D.S.*, 88 A.3d 678, 692 (D.C. 2014) (reversing custody order in neglect proceeding because trial court failed to give meaningful weight to the parental presumption before rejecting father's request for custody).

[40] *Id.* at 697.

[41] *E.g.*, *In re D.S.*, 88 A.3d at 692.

interest standard" properly, even though we may be satisfied that there is sufficient evidence in the record to support the ultimate determination.[42]

## C.

In the present case, the findings and conclusions of the trial court are incomplete: For all the detailed and well-supported factual findings and the significant "concerns" expressed about appellant's parenting ability, the trial court decisions fail to acknowledge the presumption in favor of a fit natural parent and explain why that presumption either is inapplicable in this case or is overcome by clear and convincing evidence of what A.A.'s welfare requires despite parental fitness. The decisions contain no *explicit* determination (under the correct standard of proof by clear and convincing evidence[43]) that appellant is unfit. As a result, they are susceptible to appellant's charges that the trial court merely found her a less capable or preferable caretaker for A.A. than petitioners, and that the court

---

[42] *Appeal of H.R.*, 581 A.2d at 1143 (holding that "[b]ecause the best interest standard, as applied by the trial court, did not incorporate [the necessary] parental preference,… a remand is required to apply the best interest standard as properly formulated").

[43] *See Santosky v. Kramer*, 455 U.S. 745, 758 (1982).

ignored evidence that appellant was making progress and "might become a suitable parent within the foreseeable future."[44]

To be sure, the magistrate judge's serious and justified concerns as to appellant's parenting abilities are abundantly clear from her findings (and were shared by the associate judge). The magistrate judge did not *overtly* engage in an improper comparison of appellant with the adoption petitioners,[45] and she cited the substantial evidence of appellant's *lack* of progress toward becoming a fit caretaker

---

[44] *In re C.T.*, 724 A.2d at 597. Despite this court's "general disapproval" of taking a "wait and see" approach to permanency determinations, *id.* at 599, we have recognized that "termination of parental rights might well be inappropriate where there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary." *In re L.L.*, 653 A.2d 873, 889 n.34 (D.C. 1995) (internal quotation marks omitted). We emphasize, however, that this proposition must be applied with caution, because "protracted stays in [foster] care ... may deprive [neglected] children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens." *In re T.W.*, 732 A.2d 254, 258 (D.C. 1999) (quoting *Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 835-36 (1977)); *see also In re J.G.*, 831 A.2d at 1001. Accordingly, we have held, "[i]f reunification with a biological parent is not feasible, and if a child is adoptable, then adoption is the statutorily preferred plan .... To 'wait and see' is rarely, if ever, an acceptable option when so much time has already passed." *In re T.W.*, 732 A.2d at 258 (internal citation omitted).

[45] Importantly, the magistrate judge properly focused on appellant and the petitioners in relation to A.A.'s best interest, not on how appellant and the petitioners compared to each other. For example, her findings were not that S.E.G. and S.L.G. could provide a *more* stable home for A.A. than appellant, but were to the effect that the petitioners were meeting the child's need for stability while there were reasons to doubt appellant's capacity to do so.

for A.A. despite the considerable assistance she was provided. A proper conclusion that appellant cannot parent A.A. adequately and hence is unfit may well be implicit in the magistrate judge's extended discussion of the evidence. Moreover, we do not doubt that the evidence on which the magistrate judge relied was sufficient to support a finding of unfitness. But sufficiency of the evidence is not enough for us to be confident the trial court actually made such a determination, and we cannot say it was compelled as a matter of law. For the trial court's decision in a TPR or contested adoption case to be "supported by substantial reasoning drawn from a firm factual foundation in the record"[46] and amenable to proper appellate review, it must not require us to speculate as to the court's penultimate determinations regarding the natural parent's fitness and the parental presumption. Those determinations must be set forth with clarity.[47]

For the foregoing reasons, we conclude that a remand is necessary and appropriate in this case, in order for the trial court to rectify the absence of explicit determinations regarding appellant's fitness *vel non* and whether the presumption

---

[46] *In re J.C.F.*, 73 A.3d 1007, 1012 (D.C. 2013).

[47] *Cf. In re S.M.*, 985 A.2d 413, 420 (D.C. 2009) (remanding for further proceedings where trial court did not accord natural parent the presumption in favor of a fit parent).

in favor of a fit parent has been rebutted.  Accordingly, we vacate the judgment of the Superior Court and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

NEWMAN, *Senior Judge*, concurring:   While I join the court's opinion, I write separately to state that my fertile imagination is not able to postulate a realistic factual situation where a "fit" parent can be properly deprived of parental rights based on the "best interest of the child."   However, on the premise that virtually anything is "possible," I join.