Cite as 2025 Ark. 98

# SUPREME COURT OF ARKANSAS

**No.** CV–23–41

| | | |
|---|---|---|
| ZACHARY M. OXLEY | | **Opinion Delivered:** May 29, 2025 |
| | APPELLANT | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43DR-16-744] |
| V. | | |
| LARRY RAY LUMPKINS | | HONORABLE JASON ASHLEY PARKER, JUDGE |
| | APPELLEE | <u>REVERSED AND REMANDED WITH INSTRUCTIONS; COURT OF APPEALS OPINION VACATED</u>. |

**CODY HILAND, Associate Justice**

Zachary Oxley appeals from the Lonoke County Circuit Court's order denying his motion to modify custody of his natural daughter, Minor Child 1 (MC1). For reversal, Oxley argues that the circuit erred in denying custody to him as MC1's natural parent because he was not found to be unfit. He also contends that the circuit court failed to properly apply this court's presumption in his favor as MC1's fit, natural parent during its "best–interest" analysis. Because our precedent favors awarding primary custody to a fit, natural parent over nonrelatives, we reverse and remand with instructions and vacate the opinion of the court of appeals.

## I. *Background*

Oxley and Tiffani Davis are the natural parents of MC1, born in June 2011. The two were never married but maintained a brief romantic relationship until September 2011, when Ms. Davis ceased all contact with Oxley. Oxley saw MC1 again in June 2012 and had sporadic visits with her over the next few years.

During this time, Ms. Davis had another child—Minor Child 2 (MC2), whose natural father is unknown—and began a relationship with Patrick Davis. In December 2012, Ms. Davis moved in with Mr. Davis, eventually bringing MC1 and MC2 to live with them. The Davises married a year later and had two additional children who are not relevant to our review. In September 2016, the Davises began divorce proceedings. Mr. Davis sought custody of all minor children in the relationship. It was during this time that Oxley was able to briefly see MC1 again, but Ms. Davis quickly ceased all contact shortly thereafter. In January 2017, Larry Lumpkins intervened in the Davises' divorce, seeking custody of MC1 and MC2 due to his purported *in loco parentis* standing. In February, the circuit court granted Lumpkins temporary custody of both children. In March, Oxley intervened in the Davises' divorce, petitioning the circuit court to establish the paternity of MC1.

In April, the court-appointed attorney ad litem filed a motion for DNA testing, as both Oxley and Lumpkins claimed to be MC1's natural father. Lumpkins had signed MC1's birth certificate and *also* claimed to be Ms. Davis's natural father, having raised her for a number of years. Testing revealed that Lumpkins was not biologically related to MC1, MC2, or Ms. Davis. Ms. Davis previously stated that Oxley is MC1's natural father, which the testing confirmed. In July, the circuit court adjudicated Oxley as MC1's natural father.

In September 2017, Oxley filed a motion seeking custody of MC1, alleging that Lumpkins has no blood connection to her and that he, Oxley, is her natural parent. Lumpkins argued that Oxley had waived his parental rights by failing to pursue a relationship with or provide support for MC1 despite knowing he is her natural father. In July 2018, the Davises' divorce decree was entered. In October, the circuit court awarded custody of

2

MC1 and MC2 to Lumpkins based on his *in loco parentis* status and awarded Oxley visitation with MC1. Oxley did not appeal the circuit court's initial custody order.

In June 2020, Oxley filed a petition for citation of contempt and for modification of custody, seeking enforcement of the visitation order and a transfer of primary custody of MC1. He alleged that although he exercised visitation until March 2020, Lumpkins began denying it thereafter. Oxley primarily alleged that since entry of the initial custody order, Lumpkins failed to comply with the established visitation schedule.

In September 2021, the circuit court held a hearing on Oxley's motion to modify custody. He alleged that Lumpkins neglected MC1's hygiene, failed to provide adequate care, and obstructed their relationship by refusing to follow the visitation schedule, which had last been observed in March 2020 due to the pandemic and MC2's aplastic anemia, which compromises her immune system. After a three-month gap, Lumpkins permitted video calls starting in June, but the calls, originally ten to twenty minutes, gradually shortened, allegedly due to Lumpkins's objection to MC1 speaking with Oxley's current wife, Choni, and his other daughters. Oxley did not see MC1 in person again until December, after involving legal counsel.

At the modification hearing, Oxley further alleged persistent hygiene issues, including ongoing, untreated head lice, cigarette and body odor, and excessively long nails. Choni corroborated these concerns and testified that she reported Lumpkins to DHS and local authorities for neglect, citing inadequate clothing and shoes, poor hygiene, and suspected physical abuse. Lumpkins moved for a directed verdict, arguing insufficient proof of a material change in circumstances. The circuit court denied the motion, stating, "I do

3

believe that there has been sufficient evidence to carry this case forward." The circuit court, specifically, cited "multiple issues" (i.e., Lumpkins's withholding of visitation throughout the pandemic, MC1's recurring head lice, and her potential social isolation and neglect) that justified proceeding.

At the conclusion of the hearing, the circuit court expressed "real concerns," including MC1's homeschooling, social isolation, and hygiene, and Lumpkins's persistent denial of Oxley's visitation. The court emphasized Oxley's right to see his daughter, noting he had "gone too long without seeing her" and had been "completely cut out." The court was "very disturbed about the lice issue" and concluded, despite Oxley's prior absence, that "he's here [now] and he has an absolute right to see his daughter." The circuit court also appointed an attorney ad litem to further investigate its concerns regarding MC1's custody. The circuit court then proceeded with its best-interest analysis where it determined that custody of MC1 should remain with Lumpkins.

Thus, the circuit court denied Oxley's petition to modify custody, citing the ad litem's perfunctory recommendation that it would not be in the mutual best interest of MC1 and MC2 to be separated. The recommendation consisted of a brief email that stated:

> At this time, I [am] not recommending any changes in custody in this case. My position remains that [MC1] and [MC2] should not be separated. The parties should continue to foster a relationship between [MC1] and her father[] and should work to ensure she and her father receive the previously ordered time together, as well as any additional time convenient to the parties. As the [c]ourt is aware, the parties live a long way apart, so the schedule as ordered is about all they can do most of the time. I encourage phone calls and video calls whenever possible.

4

However, based on the ad litem's recommendation, the circuit court did reinstate and expand visitation between Oxley and MC1. Oxley timely appealed, and the court of appeals affirmed. *See Oxley v. Lumpkins*, 2024 Ark. App. 480, 699 S.W.3d 742. Oxley petitioned this court for review, which we granted. When we grant review, we treat the appeal as if it were originally filed in this court. *Heileman v. Cahoon*, 2024 Ark. 164, at 5, 699 S.W.3d 85, 89.

## II. *Law and Analysis*

To begin our analysis, we note that the facts of this case are both unique and complex, presenting a novel question for our review. Our existing case law does not squarely address a circumstance in which there is a request for a custody change from a nonrelative to a fit, natural parent. Rather, our precedent largely concerns disputes between two natural parents or, in limited instances, contests between a guardian and a natural parent. Although Lumpkins is a nonrelative custodian rather than a formal guardian, the unusual posture of this case compels us to look to our guardianship case law for similar guidance.

This appeal comes to us upon Oxley's petition to modify MC1's custody. Traditionally, the analysis a circuit court employs is (1) to determine whether a material change occurred and then (2) to consider the best interests of the child. *Lewellyn v. Lewellyn*, 351 Ark. 346, 355, 93 S.W.3d 681, 686 (2002) (citing *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001)). However, in a case such as this—where the contest is between a fit, natural parent and a nonrelative custodian—requiring the circuit court to first find a material change contradicts the fit, natural parent presumption raised in this court's guardianship

5

cases.  Therefore, the circuit court erred when it required that Oxley show a material change in circumstances.

In domestic-relations cases, issues of law are reviewed de novo.  *See West v. West*, 364 Ark. 73, 80, 216 S.W.3d 557, 559 (2005) (outlining dual standards: clear error for factual issues and de novo for legal issues).  Accordingly, our review of whether the circuit court properly applied the fit, natural parent presumption, which is a question of law, is de novo.  *See id.*, 216 S.W.3d at 559.

Generally, our primary consideration in child-custody cases is the welfare and best interest of the child, and all other considerations are secondary.  *Heileman*, 2024 Ark. 164, at 5, 699 S.W.3d at 89.  However, we have also said that a fit, natural parent is given a presumption that they act in their child's best interest.  *In re Guardianship of W.L.*, 2015 Ark. 289, at 6, 467 S.W.3d 129, 133; *Morris v. Clark*, 2019 Ark. 130, at 4, 572 S.W.3d 366, 369; *Donley v. Donley*, 2016 Ark. 243, at 7, 493 S.W.3d 762, 766; *Linder v. Linder*, 348 Ark. 322, 343, 72 S.W.3d 841, 852 (2002) (all of which derived from this court's reading of *Troxel v. Granville*, 530 U.S. 57, 68 (2000)).  Further, a fit, natural parent maintains a "fundamental liberty interest in the care, control, *and custody of his or her child*[,]" and that a "fit parent's decision regarding his or her child *is conclusive*."  *In re Guardianship of W.L.*, 2015 Ark. 289, at 8, 467 S.W.3d at 134 (emphasis added); *Donley*, 2016 Ark. 243, at 10, 493 S.W.3d at 768–69. Moreover, "the custody . . . of [a] child reside[s] first in the parents, whose primary function and freedom . . . the state can neither supply nor hinder."  *Troxel*, 530 U.S. at 65–66 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).  The circuit court, however, failed to give Oxley the presumption he was rightfully owed as MC1's fit, natural parent.

Our precedent "establishes a preference for the natural parent and that preference *must prevail* unless it is established that the natural parent is unfit." *Schuh v. Robertson*, 302 Ark. 305, 306, 788 S.W.2d 740, 741 (1990) (emphasis added) (introducing that this presumption is absolute). In other words, the presumption in favor of natural parents is rebuttable, but *only* where the nonrelative custodian obtains an express finding from the court that the natural parent is unfit. *See id*., 788 S.W.2d at 741 ("[W]hen a third person seeks to deprive a parent of custody, [they] cannot do so without first proving that the parent is not a suitable person to have the child."). Lumpkins, as a nonrelative custodian seeking to retain custody, did not meet the burden necessary to rebut the presumption in favor of Oxley as a fit, natural parent. Since there was no finding that Oxley was unfit, our analysis begins and ends there.

Moreso, the attorney ad litem found Oxley to be fit. The record reflects that the ad litem favored keeping MC1 and MC2 together due to Oxley's limited prior involvement in MC1's life and due to the children's dependence upon each other. However, such a concern, while valid in a circuit court's traditional best-interest analysis, cannot rebut the presumption in favor of a fit, natural parent's right to custody of their child. Without an explicit finding that Oxley was unfit, the presumption that he, as the natural parent, is fit and acting in the best interests of MC1 prevails. Thus, as a fit, natural parent, Oxley is entitled to custody of his natural daughter. Under *Morris*, a fit, natural parent seeking custody need not prove anything further: "[*a*]*bsent a finding of unfitness*, . . . it was error for the circuit court to decline to terminate the guardianship by engaging in a best-interest analysis." 2019 Ark. 130, at 7, 572 S.W.3d at 370 (emphasis added). As *Troxel* makes clear,

the State cannot infringe on a fit, natural parent's right to make child-rearing decisions simply because a judge might prefer a different outcome. 530 U.S. at 72–73. The outcome in this case below violated that established legal standard and the presumption that a fit, natural parent unequivocally holds. The circuit court erred.

Finally, we clarify an essential point. Our holding today turns on the circuit court's failure to apply the fit, natural parent presumption in the unique context of a fit, natural parent seeking custody from a nonrelative. In such cases, where the competing custodian is a nonrelative, the fit, natural parent presumption is dispositive. Indeed, a fit, natural parent is presumed to act in their child's best interest and is entitled to custody unless the nonrelative proves the natural parent's unfitness. However, this presumption is not determinative in all cases. It will not extend to all custody disputes, such as those between two natural parents, where the presumption is applied consistent with our traditional best-interest framework. Here, Oxley—an undisputedly fit, natural parent—sought custody from a nonrelative, yet the circuit court failed to apply the presumption in his favor. That failure alone constitutes error requiring reversal. Oxley is entitled to custody of his natural-born child.

### III. *Conclusion*

Consistent with our analysis above and this court's presumption favoring fit, natural parents, we reverse and remand with instructions for the circuit court to award Oxley sole primary custody of MC1. On remand, the circuit court is not precluded from reconsidering the visitation arrangement for MC2 in light of the significant bond between the minor children and the parties' mutual desire for them to remain together.

8

We also direct the clerk to issue the mandate in this matter immediately so that MC1 can be reunited with Oxley at the conclusion of her 2024–25 academic year. This timely action will support an orderly transition, allowing MC1 to settle into her new environment and adapt to her changed circumstances. It will also enable the circuit court to address MC2's visitation promptly, helping both children adjust to the new arrangement. Given the need to minimize disruption, any delay would hinder the relief to which Oxley is entitled. *See* Ark. Sup. Ct. R. 5-3(b).

Reversed and remanded with instructions; court of appeals opinion vacated.

Mandate to issue immediately.

WOOD, J., concurring in part and dissenting in part.

**RHONDA K. WOOD, Justice, concurring in part and dissenting in part.** I concur with the majority that the circuit court deprived Oxley of the presumption he was due as a fit natural parent seeking custody of his minor child from a nonrelative custodian, that Lumpkins failed to rebut the presumption, and that Oxley should be awarded custody.

Yet I dissent from the majority's overruling of our precedent that requires anyone seeking a change of custody—even a natural parent seeking custody from a nonrelative custodian—to first meet the burden of showing a material change of circumstance.[1] The majority directly overrules the *Lloyd* precedent without discussion of it. I also dissent from

---

[1] *See Lloyd v. Butts*, 343 Ark. 620, 625, 37 S.W.3d 603, 606 (2001) (affirming a denial to change custody from a nonrelative to fit natural parents because the trial court had found there was not a material change in circumstances since the last custody award); *see also Thomas v. Avant*, 370 Ark. 377, 385, 260 S.W.3d 266, 272 (2007); *Stamps v. Rawlins*, 297 Ark. 370, 373, 761 S.W.2d 933, 936 (1988) ("A judicial award of custody should not be modified unless it is shown that there are changed conditions which demonstrate that a modification of the decree is in the best interest of the child.").

the majority's bright-line rule that the presumption in favor of custody for a fit natural parent is rebuttable only upon a showing of unfitness. As explained fully below, I concur in part and dissent in part.

Child-custody determinations require courts to balance considerations of the parents' constitutional rights with the best interests of the children. I agree with the majority's reasoning that under *Troxel v. Granville*[2] and our own precedent, a fit natural parent is entitled to a presumption that he or she acts in the best interest of his or her natural child.

Where I disagree with the majority is in its finding (unnecessary to the resolution of this case) that where the fit natural parent seeks custody over a nonrelative custodian, the presumption in favor of the natural parent is effectively unrebuttable because it can *only* be overcome by a court ruling that the natural parent is unfit. The majority's new standard puts Arkansas out of step with other states around the country, many of which are moving toward a regime that recognizes the important role nonrelative custodians can play in raising children.[3] Also, the only case the majority cites for this proposition is a 1990 case, *Schuh v. Roberson*.[4] But *Schuh* was a juvenile dependency-neglect case and applied the Juvenile Code.[5]

---

[2] 530 U.S. 57 (2000).

[3] *See* Jeff Atkinson & Barbara Atwood, *Moving Beyond* Troxel*: The Uniform Nonparent Custody and Visitation Act*, 52 Fam. L.Q. 479, 488 (2018) (noting that as of 2017, at least twenty-eight states have granted some sort of rights to de facto parents who seek custody or visitation of children, using the concepts "in loco parentis," "psychological parent," "equitable parent," and establishment of a "child-parent relationship").

[4] 302 Ark. 305, 788 S.W.2d 740 (1990).

[5] *Id.* This case developed at the time the juvenile courts were created, and the court explained that on remand it would return to the juvenile court for consideration under the Juvenile Code.

Custody disputes between fit natural parents and nonrelative custodians are more common than the majority might suggest. Many children grow up with stepparents, adult cohabitants, or others who are not legal or natural parents but who may take on a coparenting role or otherwise form significant bonds with the child.[6] Indeed, the situation is common enough that in 2018, the Uniform Law Commission approved the Uniform Nonparent Custody and Visitation Act[7]—a model act providing a proposed statutory framework for resolving conflicts over nonparent custody and visitation access to children.

I would adopt a standard in line with what the model act recommends, and which accords with the majority of states' caselaw in this area.[8] For an initial custody determination

---

[6]*See* Atkinson & Atwood, *supra* note 3, at 480 (discussing demographics from the 2018 United States Census with respect to children's living situations and bonds with others who are not legal parents).

[7]*See* Unif. Nonparent Cust. & Visitation Act (2018).

[8]Section 5 of the Uniform Nonparent Custody and Visitation Act provides:
(a) In an initial proceeding under this [act], a decision by a parent regarding a request for custody or visitation by a nonparent is presumed to be in the best interest of the child.
(b) Subject to Section 15, a nonparent has the burden to rebut the presumption under subsection (a) by clear-and-convincing evidence of the facts required by Section 4(a). Proof of unfitness of a parent is not required to rebut the presumption under subsection (a).
Unif. Nonparent Cust. & Visitation Act § 5. *See also, e.g.*, *H.S. v. N.S.*, 93 Cal. Rptr. 3d 470, 476 (Cal. Ct. App. 2009) (interpreting statute to find that the presumption in favor of natural parents may be rebutted by clear and convincing evidence when a nonparent has acted as the child's de facto parent for a substantial period of time); *In Int. of Baby A*, 363 P.3d 193, 209 (Colo. 2015) (applying presumption in favor of fit biological parent having first and prior right of custody but also holding that presumption was rebutted by clear and convincing evidence that it was in the children's best interest to grant custody to adoptive parents who had cared for children from birth); *Fish v. Fish*, 939 A.2d 1040, 1059–60 (Conn. 2008) (statutory presumption in favor of parental custody may be rebutted only in "exceptional circumstances" and "only upon a showing that it would be clearly damaging,

11

between a fit natural parent and a nonrelative or relative custodian, the presumption should stand in favor of the natural parent, unless the presumption can be rebutted by *either* a finding that the natural parent is unfit *or clear and convincing evidence* that a custody award to the natural parent is not in the best interests of the child. This leaves open the possibility for a nonrelative custodian (or nonparent custodian as I would not treat them differently) to rebut a very strong presumption in favor of the natural parent. For example, under the majority's new rule, an absentee natural parent who has never been declared unfit but who has never met the child would automatically be awarded custody over a nonparent caregiver who has raised and cared for the child all the child's life.

---

injurious or harmful for the child to remain in the parent's custody"); *In re S.L.G.*, 110 A.3d 1275, 1290 (D.C. 2015) (presumption in favor of a fit natural parent can be overcome by unfitness finding or by clear and convincing evidence of what the child's welfare requires despite parental fitness); *In re Marriage of Dafoe,* 754 N.E.2d 419, 423–24 (Ill. App. Ct. 2001) (finding that court need not find natural parent is unfit but only that third party must "demonstrate good cause or reason" and the child's best interests to overcome natural-parent presumption); *Davis v. Vaughn*, 126 So. 3d 33, 37 (Miss. 2013) ("[T]he presumption in favor of the parent may be rebutted by clear and convincing evidence that (1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody."); *Goter v. Goter*, 559 N.W.2d 834, 836 (N.D. 1997) ("When a psychological parent and a natural parent each seek a court ordered award of custody, the natural parent's paramount right to custody prevails unless the court finds it in the child's best interest to award custody to the psychological parent to prevent serious harm or detriment to the welfare of the child."); *Conover v. Conover*, 146 A.3d 433, 442, 447 (Md. 2016) (distinguishing between "psychological parents" and "pure third parties" and reconciling de facto parenthood test with *Troxel*'s emphasis on biological parent's rights); *Charles v. Stehlik*, 744 A.2d 1255, 1259 (Pa. 2000) ("[B]iological parent's prima facie right to custody is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. . . . [O]ther factors which have significant impact on the well-being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit.").

The majority again goes too far by removing the material-change requirement when a natural parent is seeking a custody modification away from a nonrelative custodian. Removing this requirement creates two problems. First, stability matters in a child's life, and this court has recognized the importance of this factor. Once an initial custody determination has been made, the child has a heightened interest in the continuity of his or her current living situation.[9] As the Supreme Court of Alaska explained in *C.R.B. v. C.C.*, "[h]aving once protected the parent's right to custody, at the risk of sacrificing the child's best interests, we should not then sacrifice the child's need for stability in care and living arrangements by modifying those arrangements more readily than in a parent-parent case."[10] The child's continuity and stability interests are independent of the custody award; thus, the requirement to show a material change in circumstance before the court can review and modify an existing custody order should stand no matter who seeks custody or who already has it. Again, removing this requirement is out of step with other courts.[11]

Second, removing the material-change requirement makes original custody decisions in these cases irrelevant. There is a reason that in civil cases we have estoppel rules to prevent

---

[9]*Stills v. Stills*, 2010 Ark. 132, at 12–13, 361 S.W.3d 823, 830 (stating "courts generally impose more stringent standards for modification in custody than for initial determinations of custody in order to promote stability and continuity in the life of the child. The party seeking modification of the custody order has the burden of showing a material change in circumstances.").

[10]959 P.2d 375, 380 (Alaska 1998).

[11]*Id.*; *In Re Ferguson*, 927 S.W.2d 768, 769 (Tex. App. 1996); *Millet v. Andrasko*, 640 So.2d 368 (La. Ct. App. 1994); *Price v. Howard*, 484 S.E.2d 528 (N.C. 1997); *Ex Parte McLendon* 455 So.2d 863 (Ala. 1984); *Grant v. Martin*, 757 So.2d 264 (Miss. 2000); *Blair v. Badenhope*, 77 S.W.3d 137, 139 (Tenn. 2002); *Guinta v. Doxtator*, 794 N.Y.S.2d 516 (N.Y. App. Div. 2005).

re-litigation of the same issues. This is why we require proof of a material change of circumstance and then start fresh since the last custody determination.[12] Yet now under the majority's new test, a natural parent who lost or waived their custody rights in favor of a nonrelative custodian could turn around and two weeks later refile—recommencing a long and difficult custody battle.[13] A child in such a situation could be continuously tied up in endless custody battles. It also gives the losing party no reason to appeal. Why appeal when you can just restart the litigation?

Family is more than just biology. While the constitutional rights of fit natural parents are very important and deserve a "finger on the scale" in an initial custody determination, the majority's biology-trumps-all rule goes too far. We want members of the community to step in and help children in need, but now if they do, their efforts can be cavalierly tossed aside without any thought either to the children or to those who are asked to make sacrifices for those children; all we will ask is whether the parent is now okay. True, that is what we

---

[12]The rules of *res judicata* are different in child-custody cases to account for changes in circumstances. *Linder v. Linder*, 348 Ark. 322, 339–40, 72 S.W.3d 841, 850 (2002) ("When the matter is a custody issue, our court takes a more flexible approach to *res judicata*. We recognize, for example, that custody orders are subject to modification in order to respond to changed circumstances and the best interest of the child.").

[13]In *Darlene S. v. Justino L.*, 533 N.Y.S.2d 179, 182 (N.Y. Fam. Ct. 1988), a New York family court addressed this exact problem thus: "If the court were to find that the custodians of Galito were required to prove extraordinary circumstances in order to retain custody of this child, it would be concluding that final orders of custody are worthless and that the custodian of a child could have no confidence in the court process since, upon demand of the natural parent, the legal custodian would bear the burden of proving that extraordinary circumstances required their continuing to have custody of the infant child. Requiring such a burden of proof to be borne by the respondents in a proceeding to modify a custody order would practically render the initial custody determination a Pyrrhic victory for the non-parent."

do in guardianship cases, but those participants enter with the knowledge that guardianships are subject to change and are more temporal in nature. And while the majority goes to great lengths to compare this to a guardianship case, it isn't one. The guardianship regime is different, and we cannot suddenly transplant guardianship law into a custody case. In fact, we have reversed decisions in guardianship cases when the court applied a child-custody analysis.[14] They are different: one is probate and the other is a domestic-relations matter.

What is most frustrating is that we are overruling precedent to remove the material-change requirement when doing so is not necessary under the current facts. The circuit court and this court believe Oxley showed a material change. And we don't need to say the natural-parent presumption is rebutted only if the natural parent is unfit, because here, on a de novo review, Lumpkins did not rebut the natural-parent presumption. I am gravely concerned that the majority is shutting doors that will be very difficult to reopen. The unintended consequence of making bright-line rules in such a complex area of the law is potential heartbreak for Arkansas families and children.

*WESTARK LAW*, by: *John R. Zaharopoulos*; *Reddick Law, PLLC*, by: *Matthew D. Swindle* and *Heather G. Zachary*, for appellant.

*Kent Tester, P.A.*, by: *Kent Tester*, for appellee.

---

[14] *See In re Guardianship of S.H.*, 2015 Ark. 75, at 7, 455 S.W.3d 313, 318, *overruled on other grounds by In re Guardianship of W.L.*, 2015 Ark. 289, 467 S.W.3d 129 ("The court erred by converting a termination-of-guardianship case into a change-of-custody case, which is the incorrect analysis.").