*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 16-FS-1291, 16-FS-1292 & 16-FS-1293

IN RE PETITION OF D.R.M.;
T.M.S., APPELLANT.

Appeals from the Superior Court of the
District of Columbia
(ADA-70-15, ADA-71-15, & ADA-72-15)

(Hon. Sean C. Staples, Magistrate Judge)
(Hon. Yvonne Williams, Associate Judge)

(Argued September 27, 2017            Decided December 20, 2018)

(Amended January 10, 2019)[*]

*Leslie J. Susskind* for appellant T.M.S.

*Sabine Browne* for appellee D.R.M.

*Rhodalyn Primes Okoroma*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, then Solicitor General, and *Loren L. AliKhan*, then Deputy Solicitor General, were on the brief, for the District of Columbia.

*N. Kate Deshler Gould*, guardian *ad litem*, filed a statement in lieu of a brief in support of appellee D.R.M.

---

[*] This amended opinion reflects a clarification in our standard of review.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant T.M.S. appeals the Superior Court's order terminating her parental rights over her three biological daughters, A.S., M.S., and T.S., and granting the adoption petition of the children's foster parent, appellee D.R.M. T.M.S. broadly argues that the magistrate judge, in his order, which the associate judge affirmed, erred in (1) finding that she was unfit to parent her children, and (2) finding that D.R.M.'s petition for adoption was in the best interests of her children. The trial court's decision that T.M.S. was unfit to parent her children and that adoption is in the best interests of the children is supported by clear and convincing evidence in the record. We affirm.

## I.     Factual and Procedural Background

The record demonstrates that on January 28, 2012, Metropolitan Police Department ("MPD") officers found ten-year-old A.S., nine-year-old M.S., and four-year-old T.S., home alone. "[T]he home had minimal electricity, no gas, was infested with mice, and had minimal food and no hot water." The children reported to the officers that T.M.S. had left the "home early that morning and had not returned by evening." Upon removal, the girls were placed at St. Ann's Infant and Maternity

Home until February 29, 2012, when they were placed together in a foster care home. On April 25, 2012, T.M.S. stipulated to the adjudication of neglect of her three daughters, admitting that "she suffered from a mental illness that impacted her ability to parent" her children, "and that her failure to receive treatment, the condition of her home and her leaving the children unattended provided a basis for the Court to find neglect pursuant to D.C. Code [§§] 16-2301 (9)(A)(ii) and (iii) [(2012 Repl.)]." As a result, the three children were put into the care of the Child and Family Services Agency ("CFSA"). On September 9, 2013, T.M.S. and the children's biological father, R.L.A.,[1] were granted supervised visitation rights. On December 20, 2014, the girls were placed into D.R.M.'s home.

Following the children's removal from T.M.S.'s home, the trial court ordered her to undergo a mental health evaluation and participate in Cognitive Behavioral Therapy ("CBT") and weekly drug tests. Following a psychiatric evaluation of T.M.S., McClendon Center psychiatrist, Dr. Steven Steury, diagnosed T.M.S. with "Adjustment [D]isorder, mixed depression [and], mixed depressed mood," and prescribed her Zoloft. T.M.S.'s treating therapist Korey Puckett, who has been treating T.M.S. using CBT, testified that T.M.S.'s symptoms include "maladaptive

---

[1] R.L.A. and T.M.S. share nine children. R.L.A. has been in and out of jail for all of the children's lives and consented to the girls' adoption.

thoughts," "crying spells and repressed feelings," which cause her to "have a heightened suspicion" of others and assume others are trying to hurt her. The record indicates that the paramount concern of Dr. Steury and Mr. Puckett is that T.M.S.'s mental illness causes "poor [behavior] choice[s]," which prevent her from putting the best interests of her children above what she wants for her children. On June 5, 2013, the permanency goal was changed from reunification to adoption.

### a. The Termination of Parental Rights ("TPR") and Adoption Hearing

The TPR and adoption hearing was held on October 15, 16, 23 and 28, 2015, before Magistrate Judge Staples. Although none of the three children testified at trial, the trial court admitted statements that they made to their counselor, James Sean Delehant, regarding their wishes for adoption and future relationship with T.M.S. All three children expressed their desire to be adopted by D.R.M., exhibited a clear understanding of the meaning of adoption, and understood "that they may lose all contact with [T.M.S.]" should they be adopted. The trial court took judicial notice that A.S., who was fourteen years old at the time, consented to the adoption, after A.S. signed and submitted to the court a consent form indicating her desire to be adopted by D.R.M. *See* D.C. Code § 16-304 (b)(1) (2012 Repl.).

At the hearing, the court heard a great deal of testimony about T.M.S.'s struggles with mental illness and her lack of progress in ameliorating the conditions that led to her children's removal.[2] The court also heard quite a bit of testimony about the children's mental, emotional, and developmental struggles and their progress throughout their time following their removal from T.M.S.'s care. The court relied primarily on the testimony of six key witnesses: the foster mother, D.R.M.; the social worker, Christine Dogger; the expert witness, Dr. Seth King; the counselor, Mr. Delehant; the birth mother, T.M.S.; and the birth mother's therapist, Mr. Puckett.[3]

---

[2] Dr. Steury has been treating T.M.S. since approximately 2010. Although he did not testify during the proceedings, portions of his reports and diagnoses were read into the record by Joy Ellis-George, the Director of Nursing and Health Services at the McClendon Center. Ms. Ellis-George testified that Dr. Steury diagnosed T.M.S. with "Adjustment [D]isorder, mixed depression, [and] mixed depressed mood" and that T.M.S.'s records also indicated mental retardation, personality disorder, general medical conditions, hypertension, psychosocial environmental problems, stressors, and financial stressors.

[3] Although the trial court relied less heavily on their testimony, the following five witnesses also testified and were credited by the court: (1) Pamela Brown of D.C. Pretrial Services; (2) Arleina Davis, a CFSA family support worker who assisted during visitations between the girls and T.M.S.; (3) Toi Bailey, A.S.'s community support worker; (4) Ashley Singleton, M.S.'s and T.S.'s community support worker; and (5) Joy Ellis-George, custodian of records for the McClendon Center.

**b. The Magistrate Judge's Ruling and the Associate Judge's Affirmance on Review**

In detailed findings of fact and conclusions of law based on the aforementioned testimony, the trial court concluded that T.M.S. was unfit to parent the girls. *See* D.C. Code §§ 16-304 (e) and -2353 (b) (2012 Repl.).[4] Therefore, the trial court concluded that T.M.S. withheld her consent to adoption contrary to the children's best interests. Finally, the trial court concluded that adoption by D.R.M. was in the children's best interests, and T.M.S.'s consent was therefore waived.

The trial court noted that T.M.S. "deeply loves her children," but that she, nonetheless, was not fit to parent the children "due to her long-term, ongoing unresolved mental health issues, refusal to admit to the neglectful conditions that her children were living in, and lack of stable housing." The trial court further reasoned that T.M.S. cancelled several scheduled visits with the children over the years. During several of the visits that T.M.S. attended, she exhibited a variety of irrational emotional states, which upset and agitated the children. Additionally, she continued

---

[4] Section 16-304 (e) provides that the trial court may grant a petition for adoption without the natural parent's consent upon finding that the natural parent is withholding consent contrary to the child's best interest. Section 16-2353 (b) outlines the Termination of Parental Rights factors, which the court must consider before determining that terminating a natural parent's right to parent a child, is in that child's best interests.

to bring large amounts of food and unhealthy snacks to visits with the children, notwithstanding that two of the three children struggled with obesity, which greatly impacted their health and wellbeing. Finally, the trial court did not find T.M.S.'s progress sufficient and did not expect her to make adequate progress in a reasonable amount of time to be able to care for her children "in a way that does not endanger their welfare."

The trial court credited D.R.M.'s testimony and found that D.R.M. provided a loving and stable home for the children. Magistrate Judge Staples further found that D.R.M. understood and was capable of addressing the children's educational, medical, and emotional needs, and that adoption by D.R.M. was in the children's best interests.

On review, Associate Judge Williams affirmed the magistrate judge's decision, finding that it was based on firm factual findings and that the magistrate judge did not abuse his discretion. The trial court thus concluded, by clear and convincing evidence, that T.M.S.'s withholding of consent was contrary to the best interests of the children. This appeal followed.

## II.  Discussion

When reviewing a proceeding to terminate parental rights and waive a natural parent's consent to adoption, we review "for abuse of discretion, errors of law, and clear lack of evidentiary support." *In re J.O.*, 176 A.3d 144, 153 (D.C. 2018) (citing *In re J.J.*, 111 A.3d 1038, 1043 (D.C. 2015)).  In our review, we must determine whether the trial court "exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors." *In re T.W.M.*, 964 A.2d 595, 601 (D.C. 2009) (internal quotation marks and citation omitted). "Legal questions are reviewed *de novo*, but findings of fact are reviewed for clear error." *In re J.O., supra*, 176 A.3d at 153 (citing D.C. Code § 17-305 (a) (2012 Repl.)).  We then evaluate "whether the trial court applied the correct standard of proof," and assess whether the "decision is supported by substantial reasoning drawn from a firm factual foundation in the record." *In re T.W.M., supra*, 964 A.2d at 601 (citation and quotation marks omitted); *see also In re J.O.*, 174 A.3d 870, 881 (D.C. 2017).

### a. The Trial Court's Determination That T.M.S. Is Unfit to Parent Her Three Children Is Supported by Clear and Convincing Evidence

Adoption requires the consent of the biological parent. D.C. Code § 16-304 (a). If, however, the biological parent has not voluntarily consented, the court may waive this consent by finding that the biological parent is unfit, *In re Ta.L.*, 149 A.3d 1060, 1081 (D.C. 2016) (en banc), and that the parent is withholding consent contrary to the child's best interests. D.C. Code § 16-304 (e). We clarified, in our en banc decision, *In re Ta.L.*, that given the presumption that a child's best interests are "served by being placed with his or her fit natural parent," prior to terminating parental rights, the court must make "an independent determination of parental fitness" and find that the natural parent is not fit to parent his or her child. 149 A.3d at 1083; *see also In re J.O., supra*, 174 A.3d at 881.[5] Once the court has found by clear and convincing evidence that the biological parent is unfit to parent the child, the court may find that a waiver of the parent's consent is in the child's best interest. *In re W.D.*, 988 A.2d 456, 459 (D.C. 2010) (internal citation omitted).

---

[5] We note that *In re S.L.G.*, which remains good law, states that "the presumption in favor of the natural parent in a TPR or contested adoption proceeding is 'rebutted only by a showing that the parent is either unfit *or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest*.'" 110 A.3d 1275, 1286 (D.C. 2015) (emphasis added; citation and footnote omitted).

A parent's "[f]itness refers to the parent's intention and ability" to care "for a child's wellbeing and meet the child's needs, with the basic inquiry focusing on whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *In re J.O., supra*, 174 A.3d at 881 (internal alternations and quotation marks omitted) (citing *In re Ta.L., supra*, 149 A.3d at 1082). The determination of whether a parent is unfit "is not merely a restatement of the 'best interests of the child'" but rather, fitness "is an independent determination of parental 'intention and ability over time.'" *In re G.A.P.*, 133 A.3d 994, 998 n.11 (D.C. 2016) (quoting *In re S.L.G., supra*, 110 A.3d at 1287). The ultimate purpose of this determination being, "to resolve the natural parent's capacity to 'care for the child' and protect the child against 'undue risk of harm.'" *In re G.A.P., supra*, 133 A.3d at 998 n.11 (quoting *In re S.L.G., supra*, 110 A.3d at 1287). Factors that may be considered in determining whether a parent is unfit include:

> past or ongoing child abuse, neglect, maltreatment, or abandonment; a failure to maintain contact with, nurture, or support the child; involvement in criminal or other activities that are seriously inimical to a child's welfare; the inability or unwillingness to make reasonable efforts to correct the behaviors or conditions that led to the child's removal from the parent's custody, to provide a safe and stable home for the child, or to meet a particular child's special needs; chronic drug or alcohol abuse; and mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm.

*In re S.L.G., supra*, 110 A.3d at 1287 (internal citation omitted). The determination of unfitness shall be focused on the parent's willingness and ability and, because unfitness is a separate determination, it should not be made by comparing the birth parent's fitness with that of the adoptive parent. *Id*. at 1288.

On appeal, T.M.S. makes the conclusory assertion that the trial court's findings that she has "long term ongoing unresolved mental health issues," which render her unfit to parent the girls, were not based on clear and convincing evidence. We disagree. There is clear and convincing evidence in the record that supports the trial court's conclusion that T.M.S.'s mental illness negatively impacts her ability to care for her children and renders her unfit to parent her three girls, given their educational, physical, mental, and emotional needs. The trial court based this conclusion on the testimony of Dr. King, Mr. Puckett, and Mr. Delehant, which it credited and which were corroborated by the credited testimonies of two CFSA social workers and two community support workers. The trial court acknowledged that T.M.S.'s multiple mental health diagnoses, the primary being Adjustment Disorder, cause her to have overly negative thoughts, an inability "to recognize the gravity of her mental health needs," and difficulties with exercising good judgment. The trial court also acknowledged that T.M.S. is prescribed Zoloft and despite telling her therapist that she takes it regularly, she admitted to her community support

worker that she does not take her medication as prescribed. The court stated that it was unable to fully credit T.M.S.'s testimony because she "refused to acknowledge any factual basis for her children's removal from her home" and "refused to answer questions regarding her current mental health diagnosis" and ongoing struggles with treatment. Finally, T.M.S.'s stipulation to suffering "from a mental illness that impacted her ability to parent" her children, and "her failure to receive treatment" formed an adequate basis for the children's April 25, 2012 neglect adjudication. T.M.S.'s circumstances have not significantly changed since then.

The fact that a parent has a mental illness does not, in and of itself, constitute a lack of fitness to parent a child. *In re D.S.*, 88 A.3d 678, 694 (D.C. 2014) ("[A] parent's poverty, ill health, or lack of education or sophistication, will not alone constitute grounds for termination of parental rights.") (quoting *In re J.G.*, 831 A.2d 992, 1000-01 (D.C. 2003)). The court's concern is with "the degree that such [illness] affects the welfare of the child." D.C. Code § 16-2353 (b)(2). The relevant determination is whether the mental illness "demonstrably interfere[s] with the parent's ability to care for the child." *In re S.L.G., supra*, 110 A.3d at 1287; *see In re P.B.*, 54 A.3d 660, 667 (D.C. 2012) (holding that in order to prove a child is neglected, the government must not only show mental incapacity but "must also

show a nexus between a parent's mental incapacity and an inability to provide proper parental care") (internal quotation marks and citation omitted).

The trial court found that T.M.S. "has consistently failed to recognize the gravity of her mental health needs and lack[s] motivation to address those needs," which prevents her from putting "the best interests of her children" above her own personal desires. In addition to Dr. King's recommendation that the children not be returned to T.M.S.'s care, T.M.S.'s treating psychiatrist of six years, Dr. Steury, also would not support T.M.S.'s efforts to gain custody of her children. Dr. Steury's reasoning was based on the fact that, during the six years he treated T.M.S., she was "never . . . forthcoming with him regarding" the details of the girls' removal from her care. T.M.S. consistently lacked an appropriate perception of the gravity of her behavior. When asked to support the girls with their academic struggles—the girls have Individualized Education Plans ("IEP") and have been diagnosed with learning disabilities—T.M.S. refused to acknowledge their academic struggles and instead responded, "my children are very intelligent." In addition, despite A.S.'s and M.S.'s diagnoses of obesity and other health concerns, T.M.S. insisted on giving her girls large amounts of unhealthy food, including sweets and fast food, at visits.

T.M.S. also was unwilling to address the problems that led to her children's removal in the first place. Before the trial court, T.M.S. denied that her children were removed from her home because it was roach- and rodent-infested, lacked electricity, that the sink and bathtub were clogged, and that trash and clutter were strewn throughout her home, even though she previously stipulated to these conditions. T.M.S. would only admit that her children were removed because their educational needs were not being met because they missed a lot of school. Despite the fact that T.M.S.'s home was unsuitable for her children, T.M.S. would not allow the social workers to visit and assess the home before the TPR and adoption hearing. Although T.M.S. regularly attended therapy with Mr. Puckett, he admitted that T.M.S.'s progress with CBT has been extremely slow—what typically takes patients one year to complete has taken T.M.S. over four years. As a result of her slow and minimal progress, based on a recent psychological evaluation, the court ordered T.M.S. to increase the frequency of her visits with Mr. Puckett. Mr. Puckett also testified that if the three girls were returned to T.M.S., they would be a stressor on her life, and she would need additional support to cope with the change.

The evidence in the record supports the trial court's conclusion that T.M.S. has a history of ongoing unresolved mental health issues that continue to impair her judgment and her ability to parent her children. While T.M.S.'s efforts in seeking

treatment and her regular visits with Mr. Puckett are commendable, her condition has not significantly improved and it still impairs her ability to adequately assess reality and respond appropriately to the needs of her children. To reiterate, the evidence shows that T.M.S. is still dealing with a high level of anxiety surrounding her children, which initially led to the deterioration of her home and the children's removal from her care. Further, T.M.S. still remains unable to acknowledge the health, developmental, and emotional issues that her children are dealing with, which negatively impacts her ability to support them in a meaningful way. Although T.M.S. maintains that she wants her children back and will be able to care for them, she has not exhibited concrete evidence of such an ability—for example, she maintains that her home is clean and organized but has denied entry by the social worker, Ms. Dogger. The combination of these conditions provides a firm basis for the trial court's ruling that T.M.S. "is not, and will not be within a reasonable amount of time, able to care for the [children] in a way that does not endanger their welfare." It was therefore not an abuse of discretion for the magistrate judge and the associate judge to find that T.M.S. is not fit to parent A.S., M.S., and T.S.

**b. The Trial Court's Determination That Waiving T.M.S.'s Consent to the Adoption of Her Three Children Is Supported by Clear and Convincing Evidence**

The paramount consideration in TPR and adoption cases is the best interest of the child, which is presumptively served by placing the child with a fit natural parent. However, this presumption is not absolute and must "give way" when clear and convincing evidence shows that a parental placement is contrary to the child's best interest—either because the parent is unfit or because exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest. *See In re S.L.G., supra*, 110 A.3d at 1285-86; *see also In re J.O., supra*, 174 A.3d at 882. The court must make a finding that the natural parent is withholding her consent contrary to the best interests of the child. *In re S.L.G., supra*, 110 A.3d at 1285. In deciding what is in the child's best interests, the court shall look to the TPR factors because granting a petition for adoption over a natural parent's consent effectively terminates their rights. *Id*. "The court must weigh the same statutory factors that are considered in a TPR proceeding to decide whether termination is in the child's best interest." *Id*. Four of those factors are relevant here:

> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; [and]
>
> . . .
>
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter[.]

D.C. Code § 16-2353 (b). If, upon weighing these factors, the court finds that a parent is withholding his or her consent contrary to the child's best interests, then the court may waive the parent's consent.

The trial court applied the TPR framework and found that T.M.S. was not entitled to the presumption that the girls' best interests would be served by T.M.S. The trial court weighed each of the factors and determined that the outcome favored keeping the girls with D.R.M. We are satisfied that the trial court's determinations were supported by clear and convincing evidence in the record that the girls' best interests were served by placement with D.R.M. and that T.M.S.'s consent should therefore be waived.

### i. The Children's Need for Continuity of Care and Caretakers

With respect to this first factor, the trial court emphasized that D.R.M. has provided a stable and supportive family environment for the three girls. Although T.M.S. has indicated she wants her girls back, the evidence of her lack of fitness indicates that she will not be able to provide a stable home for the girls anytime soon. The record does not indicate a reason to disturb the trial court's determination that this factor weighs in favor of keeping the girls under D.R.M.'s care.

### ii. The Physical, Mental, and Emotional Health of All Individuals Involved

In weighing this second factor, the trial court noted that D.R.M. has taken every measure to maintain the girls' health and development since the girls entered D.R.M.'s care in December 2014; for example, D.R.M. takes the girls to the park to stay active, encourages them in school, and has fully integrated them into her family and her extended family. The children initially struggled with emotional and mental health issues, including sadness, depression and abandonment issues, but their conditions have improved since living with and adjusting to life with D.R.M., and attending therapy.

The trial court found that, in contrast, although T.M.S. is informed of the girls' IEP meetings and doctors' appointments, she either does not attend or she participates via telephone; further, although she is aware that her older girls are considered obese, she insists on bringing the girls unhealthy food to scheduled visits. The trial court noted that T.M.S. continues to battle her own mental health issues, which negatively impact her ability to adequately take care of the three girls' unique physical, mental, and emotional needs. The trial court thus properly found that this factor also weighs in favor of keeping the girls with D.R.M. and we discern no error.

### iii. The Quality of the Interaction and Interrelationship of the Children with Their Parent, Siblings, Relative, And/Or Caretakers, including the Foster Parent

The trial court weighed the third factor and concluded that the children love T.M.S. but that their relationship with her is not healthy for them. During visits, T.M.S. has overshared her health issues with her children including that she has high blood pressure, "she might die," that "her tooth was falling out" and that she had problems with her hair. These statements caused the two older girls, A.S. and M.S., a lot of stress and worry over her well-being. The girls' therapist, Mr. Delehant, testified that T.M.S.'s emotional state "could be anywhere from excited to depressed, to tearful, confused, [or] happy," which made the children "anxious." The oldest child, A.S., acknowledged that T.M.S.'s home is "not a good place to

return to for her and her sisters" and the middle child, M.S., "wishes things were better" with T.M.S.

The trial court determined that living with D.R.M. has given M.S. a "sense of safety." The trial court credited Mr. Delehant's testimony that the girls were initially "more withdrawn" and "anxious" with D.R.M. but have adjusted well to her and now have a calm and trusting demeanor with "very good signs of attachment and bonding." Further, the trial court relied on community support worker Ms. Singleton's testimony that the girls are bonded to D.R.M. and her daughter as M.S. "really really likes D.R.M.'s daughter." The trial court ultimately concluded that the girls have a loving and trusting relationship with D.R.M., who supports them in every aspect of their lives and is a reliable mother to them. Further, the trial court noted that although the children love T.M.S. and have a relationship with her that cannot be discounted, the overall quality of the interactions and interrelationship of the children with D.R.M. is substantially greater. Therefore, the trial court did not abuse its discretion in finding by clear and convincing evidence that this factor weighed in favor of the adoption.

#### iv. The Children's Opinion of Their Own Best Interests

The trial court weighed this fourth factor and credited the testimony of Dr. King that the children wanted to live with their adoptive mother and not their biological mother. The girls' guardian *ad litem* as well as their social worker Ms. Dogger also testified in support of the adoption. According to the testimony of Mr. Delehant and Dr. King, which the trial court credited, the children understood what adoption meant and that there was a possibility that they may no longer have visits with T.M.S., and all three still wished to be adopted by D.R.M. The trial court did not abuse its discretion by concluding the children wanted to be adopted by D.R.M.

The trial court did not err in finding by clear and convincing evidence that the relevant statutory factors weighed in favor of keeping the girls with D.R.M., and concluding that it was in the girls' best interests to terminate T.M.S.'s parental rights and grant the adoption petition by D.R.M.

### III. Conclusion

T.M.S.'s significant mental health diagnoses and challenges severely impact her ability to care for her children and render her unfit to parent A.S., M.S., and T.S.,

given their specific learning disabilities and physical and emotional health concerns. The magistrate judge's findings were supported by clear and convincing evidence in the record demonstrating that T.M.S. is not fit to parent the girls and which satisfies each of the applicable TPR factors. *In re J.G., supra*, 831 A.2d at 1001. The adoption is necessary to protect the girls "from protracted legal limbo" and "to afford them a stable and permanent home," which T.M.S. is unable to provide. *Id*. at 1004.

*Affirmed.*