*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 22-FS-0557; 22-FS-0558 & 20-FS-559

IN RE: PETITION OF P.M.B.; J.B., APPELLANT,

(2021-ADASLD-000104, 2021-ADASLD-000105 & 2021-ADASLD-000106)

and

IN RE: PETITION OF S.H. & J.B., J.R.; J.B., APPELLANT

Nos. 22-FS-0667 & 22-FS-0668

(2021-ADASLD-000133 & 2021-ADASLD-000134)

Appeals from the Superior Court of the
District of Columbia

(Hon. Adrienne J. Noti, Magistrate Judge)
(Hon. Robert A. Salerno, Associate Judge)

(Submitted February 15, 2023                    Decided March 22, 2023[*])

*Murphy B. Henry* for appellant.

*Pamela Soncini*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time the brief was filed, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the brief, for appellee.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment.  Upon consideration of a motion to publish filed by the District of Columbia, we grant the motion and publish this Opinion.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges.*

SHANKER, *Associate Judge*: J.B., the biological father of five children ranging from five to ten years old, appeals from a Superior Court order affirming a magistrate judge's Findings of Fact, Conclusions of Law, and Order Granting Adoption Petitions.[1] The magistrate judge found that (1) J.B. was unfit to parent the children, and (2) J.B. withheld his consent to adoption contrary to the best interests of the children. The magistrate judge also granted the adoption petitions of P.M.B., S.H., and J.B. Jr. (the "prospective adopters").[2] J.B. asserts that the record does not support the magistrate judge's findings that he is unfit to parent and that he withheld his consent to adoption contrary to the children's best interests. J.B. also argues that the magistrate judge committed legal error by (1) improperly comparing J.B. with the prospective adopters, (2) relying on J.B.'s poverty and poor health as factors in determining the children's best interests, and (3) allowing prospective adopters' counsel to ask leading questions during trial. For the reasons set forth below, we affirm.

---

[1] J.A.L.S., the biological mother of the children, consented to adoption and takes "no position" on appeal. *See* Statement in Lieu of Brief (Appellee J.A.L.S.).

[2] P.M.B. petitioned to adopt children J.O., J.A.M.B., and J.L.O. S.H. and J.B. Jr. petitioned to adopt children J.E.X.M.B. and J.A.B.W.L.

## I.    Background

In August 2018, amid allegations of chronic neglect, the Child and Family Services Agency ("CFSA") removed the children from their birth parents' custody. The children were eventually placed in foster homes with their prospective adopters. In October 2018, the magistrate judge adjudicated the children neglected. *See* D.C. Code §§ 16-2301(9)(A), -2320. Over the next several years, the magistrate judge held a series of permanency hearings for the children.[3] *See* D.C. Code § 16-2323. In each of these hearings, the magistrate judge found that CFSA had made reasonable efforts to help J.B. achieve reunification but that J.B. had failed to make adequate progress. At the October 2020 permanency hearing, CFSA requested a permanency goal change to adoption, and the magistrate judge set an evidentiary hearing, as required by *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc).

---

[3] The magistrate judge held at least five permanency hearings between October 2018 and December 2020. At some hearings, the magistrate judge found that J.B. had made progress in, for example, parenting classes and couples counseling. At others, the magistrate judge found that J.B. had regressed or failed to comply with recommended services, including therapy. In November 2020, J.B. informed CFSA that he was moving to New York and would no longer participate in the neglect case. At the following permanency hearing in December 2020, the magistrate judge found that J.B. was no longer participating in services or consistently visiting the children.

Between May and June 2021, the magistrate judge held a five-day *Ta.L.* hearing via video conference, in which it heard testimony from two CFSA social workers, the mother, and J.B. The magistrate judge found that CFSA had provided J.B. with a reasonable plan to achieve reunification, but that J.B. had failed to make adequate progress toward reunification. In particular, J.B. had refused to complete his court-ordered mental health treatment and had not derived any benefit from his parenting classes or domestic violence counseling despite completing those courses. According to testimony, J.B. continued to "yell[ ] at and threaten" the children during visits, display uncontrolled outbursts of anger, and verbally abuse the children's mother. Based on these findings, the magistrate judge concluded that CFSA made "reasonable efforts in support of reunification" but that the parents failed to make "adequate progress towards satisfying the requirements of the plan." On that basis, the magistrate judge changed the children's permanency goal from reunification to adoption. *See* D.C. Code § 16-2323. This court summarily affirmed that ruling. Judgment, *In re Jo.L., et al.*, Nos. 21-FS-0697 & 21-FS-0701 (D.C. Feb. 22, 2022) (finding that "the agency expended reasonable efforts" to achieve reunification, including by "develop[ing] six written case plans that detailed each parent's requirements for reunification," but that J.B. "either did not complete all of the court-ordered services or failed to show improvement" in certain areas).

Following the goal change, the children's respective foster parents filed petitions to adopt. *See* D.C. Code §§ 16-302, -305. In January 2022, the magistrate judge held a three-day adoption proceeding, *see* D.C. Code § 16-309, wherein it heard testimony from seven witnesses, including three social workers, a forensic psychologist, the prospective adopters, and J.B. The magistrate judge credited the testimony of each of the social workers, the forensic psychologist, and the prospective adopters. The magistrate judge concluded "that much of [J.B.'s] testimony lack[ed] credibility."

The social workers—all of whom had supervised the virtual[4] and in-person visits[5] between J.B. and his children—testified that J.B. had significant ongoing anger issues, failed to meaningfully interact with the children, and took no interest in the children's health, education, or wellbeing outside the short time he spent with them each week. J.B. sometimes lashed out in anger or yelled obscenities at the children and often conducted the virtual visits while he was at work, with others, or

---

[4] In March 2020, the District of Columbia declared a public health emergency due to the COVID-19 pandemic. As a consequence, J.B. usually met with the children virtually.

[5] One social worker ceased supervising in-person visits following the goal change because she had received a threatening telephone call from J.B. and was concerned for her safety.

in places with poor Internet service. J.B. did, however, usually provide a meal during in-person visits and gave each child a small allowance.

Dr. Jennifer Carter, an expert in parenting capacity, testified regarding her 2019 evaluation of J.B. After J.B. arrived several hours late to his appointment, he refused to complete any of the court-ordered testing except for the initial clinical interview. J.B. also failed to engage in individual therapy. Dr. Carter opined that J.B.'s failure to engage demonstrated a lack of motivation to reunify.

J.B. testified that he was aware that he was required to take parenting classes, engage in therapy, and participate in anger management classes. J.B. testified that he had completed these services, but he provided no documentation of having completed anger management classes or therapy. J.B. could not state where the children attended school and claimed he was "kept in the dark" regarding their mental and emotional health.

Based on the above testimony, the magistrate judge found J.B. unfit to parent the children and concluded that he was withholding his consent to adoption contrary to the children's best interests. *See* D.C. Code §§ 16-304(e), -2353(b). The

magistrate judge also granted the prospective adopters' petitions. *See* D.C. Code § 16-309.

The reviewing associate judge, applying the same standard of review as this court would apply on appeal of a judgment or order of the Superior Court, *see In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012), affirmed the magistrate judge's rulings. The reviewing judge rejected J.B.'s argument that the evidence presented was insufficient to find him unfit or to find that he was withholding consent to adoption against the children's best interests, concluding that the magistrate judge's findings were "well-supported by the record." The reviewing judge also concluded that the magistrate judge properly considered J.B.'s housing situation.

## II. Standard of Review

We review "a trial court's order granting an adoption for abuse of discretion, and determine[ ] whether the trial court exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factor." *In re T.J.*, 666 A.2d 1, 10 (D.C. 1995) (internal quotations omitted). "Legal

questions are reviewed de novo, but findings of fact are reviewed for clear error." *In re J.O.*, 176 A.3d 144, 153 (D.C. 2018).[6]

Regarding questions of fact, this court "must also respect the prerogative of the [trial] judge . . . to determine credibility and weigh the evidence." *In re Jam.J.*, 825 A.2d 902, 910 (D.C. 2003) (alterations in original) (internal quotation marks omitted). "The trial court's findings of fact are entitled to great deference on appeal; we cannot set them aside 'unless they are plainly wrong or without any evidentiary foundation.'" *In re T.J.L.*, 998 A.2d 853, 860 (D.C. 2010) (quoting *In re Baby Boy C.*, 630 A.2d 670, 683 (D.C. 1993)). In particular, the reviewing court "will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *In re E.H.*, 718 A.2d 162, 169 (D.C. 1998) (internal quotation marks omitted).

---

[6] "We are mindful that from a procedural standpoint, our role is to review the order of the [Superior Court], not the magistrate judge." *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012). We may, however, also "look to the findings and conclusions of the fact finder on which [the Superior Court order] is based." *In re J.O.*, 176 A.3d 144, 153 (D.C. 2018) (internal quotation marks omitted).

## III.    Analysis

### A.    The record supports the magistrate judge's findings of fact and conclusions of law.

An adoption ordinarily requires the consent of the biological parents.  D.C. Code § 16-304(a).  But a court may waive the consent of one or both biological parents if it finds both that the parent is unfit and that the parent is withholding consent to the adoption contrary to the best interest of the child.  D.C. Code § 16-304(e).

J.B. first argues, in effect, that the record evidence does not support the magistrate judge's findings that he is unfit to parent and that he withheld his consent to adoption contrary to the best interests of the children.  We disagree.  The record amply supports the magistrate judge's findings and conclusions, particularly in light of our deferential standard of review.

### 1.  The magistrate judge properly found J.B. unfit to parent under the *In re S.L.G.* factors.

Biological parents have a fundamental liberty interest in preserving the relationship between parent and child.  *Santosky v. Kramer*, 455 U.S. 745, 753

(1982). This fundamental interest gives rise to a legal "presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit." *In re S.M.*, 985 A.2d 413, 417 (D.C. 2009). Due to this presumption, a court must first make an independent assessment of parental fitness before considering whether adoption is in the child's best interest. *In re Ta.L.*, 149 A.3d 1060, 1081-82 (D.C. 2016) (en banc). The presumption of parental fitness is "a strong one" that "reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children . . . ." *In re S.L.G.*, 110 A.3d 1275, 1286 (D.C. 2015). Evidence of a parent's unfitness must be clear and convincing. *In re J.B.S.*, 237 A.3d 131, 147 (D.C. 2020) (en banc). "[T]he question of parental fitness is almost always at the heart of any proceeding to terminate parental rights or waive a natural parent's consent to adoption." *In re S.L.G.*, 110 A.3d at 1286.

Although "parental 'fitness' is not a statutorily defined term in this jurisdiction," it refers broadly to "the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs." *Id.* The fitness inquiry, therefore, turns on whether the parent "is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Id.* at

1286-87. Though not exhaustive, the factors a court should consider when determining whether a natural parent is fit include:

> [1] past or ongoing child abuse, neglect, maltreatment, or abandonment; [2] a failure to maintain contact with, nurture, or support the child; [3] involvement in criminal or other activities that are seriously inimical to a child's welfare; [4] the inability or unwillingness to make reasonable efforts to correct the behaviors or conditions that led to the child's removal from the parent's custody, to provide a safe and stable home for the child, or to meet a particular child's special needs; [5] chronic drug or alcohol abuse; and [6] mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm.

*Id*. at 1287.

In applying the *S.L.G.* factors, the magistrate judge found that J.B. was unfit to parent "as evidenced by a variety of his behaviors: his failure to nurture the children and to maintain appropriate contact with them . . .; his unwillingness to make reasonable efforts to correct his behaviors . . .; his failure to provide a safe and stable home . . .; and his mental health, domestic violence, and anger issues . . . ." These findings are well supported by the record.

First, we find no clear error in the magistrate judge's determination that J.B. failed to maintain contact with or nurture his children. Although J.B. "seldom" missed visits entirely, the quality of J.B.'s visits with the children was lacking. In particular, J.B. was unable to give the children his undivided attention during their weekly visits, which he often held during work or while he was preoccupied with other matters despite having specifically requested those visitation times. On many occasions, J.B. engaged with the children "for only approximately 15 minutes of the one-hour visitation."[7] Additionally, during virtual visits, J.B. was often unable or refused to turn on his video camera or have consistent audio. J.B. appeared for virtual visits on the Metro on several occasions, which caused additional interference.

The record supports the magistrate judge's finding that when J.B. did commit to his children, he often engaged in problematic behavior. During both in-person and virtual visits, J.B. displayed "outbursts of anger," including screaming at and threatening the children. On one occasion, J.B. "physically grabbed" one of the children from a social worker, took off his belt, and threatened to "whip his [child's]

---

[7] The magistrate judge weighed this fact particularly heavily: "Regardless of his explanation [for holding shortened visits], [J.B.] was unable to give his children his undivided attention *for even 15 minutes a week*. Parenting 10-15 minutes per week is not sufficient evidence of the ability to independently parent and weighs strongly against his fitness."

ass." J.B. often used inappropriate language in front of the children and failed to supervise them. Aside from these frequent outbursts of anger, J.B. was also unable to console his children or connect with them emotionally.

To be sure, as J.B. argues, virtual visits are not an ideal way to connect with one's children. We have never, however, held that such visits categorically impinge upon a parent's "right of visitation." *See Wilkins v. Ferguson*, 928 A.2d 655, 667 (D.C. 2007). After all, such a right "is not absolute." *Id.* Other jurisdictions, moreover, have at least impliedly upheld virtual or telephonic visitations. *See, e.g., In re J.C.*, 873 S.E.2d 757, 762-64 (N.C. 2022); *Thaddeus v. Sec'y of Exec. Office of Health and Hum. Servs.*, 193 N.E.3d 472, 420-21 (Mass. 2022); *Interest of O.O.*, No. 13-21-00411-CV, 2022 WL 1559725, at *15-16 (Tex. App.–Corpus Christi, May 17, 2022); *Interest of C.G.*, No. 20-1102, 2020 WL 7021684, at *2 (Iowa Ct. App. Nov. 30, 2020). Here, virtual visits were justified due to the public health emergency, *see supra* note 4, and because they allowed J.B. to see his children while he was at work.

Second, the magistrate judge's determination that J.B. was unwilling to make even basic efforts to correct the conditions that led to the children's removal is supported by the record. As the magistrate judge found, J.B. did not demonstrate

that he can provide a safe and stable home, "as evidenced by his limited housing and inability to [safely] care for [the children] during in-person visits." J.B. declined to provide his address to CFSA so that they could assess his housing. The magistrate judge relied on J.B.'s own testimony that his housing situation was not suitable for five children. J.B. also lacked any involvement in his children's lives outside of his short weekly visits and had not inquired about his children's education or healthcare needs. This is particularly problematic, as several of his children have special mental, emotional, or educational needs.

Third, we defer to the magistrate judge's conclusion that J.B. was not willing to comply with court-ordered plans to achieve reunification. J.B. refused to complete his court-ordered anger management courses. The magistrate judge did not credit J.B.'s testimony that he attended anger management classes, as he provided no proof of completion. Nor did J.B. complete a required psychological examination or attend individual therapy, demonstrating, as the magistrate judge found, "a lack of motivation to reunify" with his children. Although J.B. completed "some" parenting classes and a 27-week domestic violence course (which he was ordered to take following verbal and physical abuse of his then-wife), the magistrate judge found that J.B. took little from these courses. For example, J.B. verbally threatened J.A.L.S., the children's birthmother, as recently as 2021.

As a result of J.B.'s unwillingness or inability to correct the conditions that led to the children's removal, J.B.'s children "have not returned to stay with him, even temporarily, due to his failure to comply with court orders and his inability to show that he has made any changes to ameliorate the issues that led to [the children's] removal." Indeed, J.B. was not even granted unsupervised visitation apart from a short period in 2019.

Finally, we note that the magistrate judge reviewed J.B.'s fitness under both the non-exhaustive *S.L.G.* factors and the Termination of Parental Rights ("TPR") factors set forth in D.C. Code § 16-2353(b) (both discussed in more detail below). The reviewing judge and the District of Columbia, however, correctly applied only the *In re S.L.G.* factors at the parental-fitness stage, reserving the TPR factors for the consent-waiver/best-interest prong of the analysis.

In *In re S.L.G.* we stated that "[t]he same statutory factors that guide the court's determination of a child's best interest in a TPR or contested adoption proceeding [that is, factors under D.C. Code § 16-2353(b)] also guide the court's assessment in that proceeding of the natural parent's fitness *vel non*." 110 A.3d at 1287. Later decisions, however, have stressed the procedural and substantive

independence of the fitness test vis-à-vis the TPR best-interest factors. *See In re Ta.L.*, 149 A.3d at 1083; *In re J.B.S.*, 237 A.3d at 143 ("[O]ur cases now generally require that the trial court make a parental unfitness determination before undertaking a 'best interests of the child' analysis."). Additionally, Supreme Court decisions and subsequent decisions of this court have consistently reserved the best-interest factors for the consent-waiver inquiry. *See Santosky*, 455 U.S. at 760 ("But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their relationship."); *In re D.R.M.*, 198 A.3d 756, 763 (D.C. 2018); *In re J.O.*, 176 A.3d at 153-54. This is because the fitness inquiry is concerned primarily with "the parent's intention and ability" to care "for a child's wellbeing and meet the child's needs, with the basic inquiry focusing on whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare," rather than what would be ideal for the child. *In re J.O.*, 176 A.3d at 762. Accordingly, the fitness test cannot correspond precisely with a best-interest analysis under the § 16-2353(b) factors. Aside from the factors set out in *S.L.G.*, we have not expanded on the content of the fitness test.

Whatever the exact nature of the fitness prong, the trial court does not commit reversible error if (1) consistent with *In re Ta.L.*, it "conducted a proper bifurcated

analysis in which a threshold finding of unfitness preceded a determination of whether the best interests of the child warranted a termination of parental rights," *In re K.C.*, 200 A.3d 1216, 1241 n.21 (D.C. 2019), and (2) it assessed, at a minimum, each relevant *S.L.G.* factor independently of the TPR factors. Here, even though the magistrate judge considered the TPR factors under the same heading as its parental fitness examination, it did so only after it independently analyzed J.B.'s fitness under *S.L.G.* and found J.B. unfit under those factors, without regard to the prospective adopters. Accordingly, the magistrate judge did not commit reversible error in this respect.

In sum, we cannot say, based on the record—described only in small part above—that the magistrate judge abused her discretion in finding J.B. unfit to parent the children.

**2. The magistrate judge correctly determined that J.B. improperly withheld his consent to adoption contrary to the children's best interests.**

Although the consent of each biological parent is ordinarily required prior to the granting of an adoption, D.C. Code § 16-304(a), the trial court may determine that the parent's consent should be waived pursuant to § 16-304(e), which provides that a "court may grant a petition for adoption without any of the consents specified

in [§ 16-304(a)], when the court finds . . . that the consent [is] withheld contrary to the best interest of the child." *In re C.L.O.*, 41 A.3d 502, 510-11 (D.C. 2012). Granting "an adoption over a natural parent's objection is the functional equivalent of a termination of parental rights." *In re J.O.*, 176 A.3d at 156 (internal quotation marks omitted). Accordingly, the court must assess whether to waive the biological parent's consent under the same factors that apply in TPR proceedings, namely, the best-interest factors set out in D.C. Code § 16-2353(b). *In re S.M.*, 985 A.2d 413, 416 (D.C. 2009). These factors are:

> (1) The child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) The quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives, and/or caretakers, including the foster parent; . . .
>
> (4) To the extent feasible, the child's opinion of his or her own best interests in the matter; and
>
> (5) Evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided . . . .

D.C. Code § 16-2353(b).[8]   The reviewing judge "has wide latitude in applying th[ese] statutory criteria." *In re An.C.*, 722 A.2d 36, 39 (D.C. 1998).

Again, J.B. does not argue that the magistrate judge applied an incorrect legal standard or considered inappropriate factors, except as addressed below in Part III.B. Rather, he argues only that the record does not support, by a preponderance of the evidence, that he withheld his consent contrary to the children's best interests. We disagree. For largely the same reasons identified above and found by both the magistrate judge and the reviewing judge, the record amply supports the magistrate judge's conclusions on each of the § 16-2353(b) factors.

First, we see no clear error in the magistrate judge's determination that J.B. is unable to provide continuity of care for the children and is unlikely to provide consistent, stable housing. As discussed above, J.B. has not demonstrated an interest in the children's education, healthcare, or emotional needs. Returning the children to his care risks undoing the significant progress that they have made while in the care of their foster parents. Many of the children presented with developmental

---

[8] "[T]he constitutional requirement of clear and convincing evidence applies only to proof of a parent's unfitness to care for a child; once that is established, it comports with due process for the child's best interests to be proved by a preponderance of the evidence, whether the parent consents or not." *In re J.B.S.*, 237 A.3d at 147.

delays and emotional difficulties after being removed from J.B.'s care.  Now the children "receive[ ] specialized services, including play therapy and trauma informed therapy."  One of the children had a history of developmental and verbal delays when she was in J.B.'s care, yet is now "at the top of her class in reading."  Additionally, as described above and at length in both trial court opinions, J.B. lacks sufficient housing to care for the children.  Although J.B. asserts that he would take steps to find adequate housing, the magistrate judge found his testimony not credible in this regard.

Second, we conclude that the record supports the magistrate judge's conclusion that both J.B.'s and the children's "physical, mental, and emotional health" counsel in favor of waiving J.B.'s consent.  J.B. himself is in "poor physical, mental, and emotional health" and may be physically unable to care for the children.  Similarly, and as discussed at length already, returning custody to J.B. risks physical, mental, and emotional harm to the children.  As Dr. Carter testified, "it would place the children in a vulnerable position with adjustment difficulties that could manifest in emotional and behavior[al] problems."

Third, the record supports the magistrate judge's determination that J.B. and the children do not share a nurturing and loving relationship such that it is in the

children's best interests to be returned to his custody. The record is rife with examples of inappropriate comments and behavior toward the children, J.B.'s inattentiveness during visits, his overall lack of concern for the children's health and educational needs, and his outbursts of anger. The relationship between J.B. and the children stands in stark contrast to the relationship between the children and their foster parents, which is "strong, healthy, and supportive." Due in large part, no doubt, to this relationship, several of the children have demonstrated concrete lifestyle improvements since moving in with their respective foster parents.

Finally, the record reflects that there is "some evidence" that two of the children have expressed the desire to stay with their foster parents. For example, one of the children "does not seem to engage with [J.B.] and reacts poorly after visits with him." The remainder of the children are too young to have a well-formed opinion on the matter. Given the dearth of evidence on this point and the age of the children, both the magistrate judge and the reviewing judge properly gave little weight to this factor.

Accordingly, the record supports the conclusion that the § 16-2353(b) factors justify a finding that J.B. is withholding his consent to adoption contrary to the best interests of the children.

**B.** **The legal issues raised by J.B. lack merit.**

In addition to challenging the sufficiency of the record, J.B. raises three legal arguments, each of which is unpersuasive.

**1. The magistrate judge did not improperly compare J.B. with the prospective adopters in assessing the children's best interests under D.C. Code § 16-2353(b).**

J.B. argues that magistrate judge improperly compared him to the prospective adopters. J.B. forfeited this argument by failing to raise it in his motion for review in the Superior Court. *See In re S.G.*, 581 A.2d 771, 783-84 (D.C. 1990) (holding that father's failure to raise argument in trial court proceeding amounted to abandonment of the claim on appeal).

In any event, while the inquiry at the second, best-interest stage of the analysis is "not to determine whether the adoption petitioners would be better parents, or would provide a better home for the children," *In re J.L.*, 884 A.2d 1072, 1077 (D.C. 2005); *see In re S.L.G.*, 110 A.3d at 1287-88 ("this court has admonished that a termination of a natural parent's rights may not be based on a direct comparison of the natural parent with the adoption petitioners"), the trial court *is* to consider "all

persons involved with the child . . . in relationship to the best interests of the child," and "[t]he child's relationship with the adoption petitioners may have a bearing on the TPR decision," *In re S.L.G.*, 110 A.3d at 1288. *See also* D.C. Code § 16-2353(b)(3) (court shall consider "the quality of the interaction and interrelationship of the child with his or her parent . . . *and/or caretakers, including the foster parent*") (emphasis added); D.C. Code § 16-2353(b)(2) (court shall consider "the physical, mental and emotional health of *all individuals involved* to the degree that such affects the welfare of the child . . .") (emphasis added).[9] The record reflects that the magistrate judge simply engaged in that appropriate analysis.

---

[9] In light of *Ta.L.*, a court also may not compare the prospective adopters with the natural parents at the first, parental-fitness step. *See In re D.R.M.*, 198 A.3d 756, 763 (D.C. 2018) ("The determination of unfitness shall be focused on the parent's willingness and ability and, because unfitness is a separate determination, it should not be made by comparing the birth parent's fitness with that of the adoptive parent."). If the biological parent is found fit, there is a "strong presumption that placement with a natural parent is in the child's best interest." *In re J.O.*, 176 A.3d at 156. Although it is theoretically possible that the best interest of the child can override this presumption, *see In re Ta.L.*, 149 A.3d at 1083, it is quite difficult "to postulate a realistic factual situation where a 'fit' parent can be properly deprived of parental rights" at the second prong of the analysis, *Appeal of H.R. (In re Baby Boy C.)*, 581 A.3d 1141, 1176-79 (D.C. 1990) (Newman, J., concurring). If, however, the court finds that the biological parent is unfit, the presumption in favor of the natural parent "falls away" at the best-interest stage. *In re J.O.*, 176 A.3d at 156.

Here, the magistrate judge properly considered J.B.'s fitness in isolation from the prospective adopters and did not apply a presumption in favor of J.B. at the best-interest stage.

## 2. The magistrate judge did not improperly terminate J.B.'s parental rights based on his inadequate housing.

Relying on *In re J.L.*, 884 A.2d 1072, J.B. argues that the magistrate judge improperly "dwelt" on his lack of adequate housing, a consideration "directly related to poverty and his poor health," which would be impermissible factors to consider in determining whether to terminate parental rights. J.B.'s argument that the magistrate judge placed undue weight on this factor is not supported by the record. Although the magistrate judge did consider J.B.'s housing, she did so only in relation to his ability to "actually care for his five children" and in the context of the children's best interests. *See* D.C. Code § 16-2353(b)(1) (in determining the child's best interest, a court must consider the "need for continuity of care . . . and for timely integration *into a stable and permanent home . . .*") (emphasis added). Far from "dwel[ling]" on the issue, the magistrate judge properly considered J.B.'s housing in relation to his parental responsibilities and as merely one factor among many in ultimately terminating his parental rights. *See In re J.L.*, 884 A.2d at 1077 ("Parental rights, therefore, may not be terminated *solely* because of poverty, ill-health, or lack of education or sophistication . . . .") (emphasis added).

### 3. The magistrate judge did not abuse her discretion in allowing adoption petitioners' counsel to ask leading questions.

J.B. argues that "[t]hroughout [adoption] petitioners' counsel['s] direct examination of the social workers in particular, there were instances of counsel leading the witnesses." The record does reveal instances in which adoption petitioners' counsel asked leading questions. J.B., however, failed to raise this issue when seeking review in the Superior Court. Even if he had preserved the claim, J.B. does not identify, with sufficient specificity, which questions he finds objectionable and what prejudice occurred as a result. *See Wagner v. Georgetown Univ. Medical Ctr.*, 768 A.2d 546, 554 n.9 (D.C. 2001) (the "bare mention" of a claim "does not suffice to preserve the argument for our consideration"); D.C. App. R. 28(a)(10) (brief must contain an argument "containing the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). J.B.'s mere reference to counsel's "leading questions" does not sufficiently narrow the issue for our review. *Id.*

In any event, "[t]he trial court has fairly broad discretion to allow leading questions to be asked, and reversal is usually not required if the record shows that the court exercised that discretion." *Bailey v. United States*, 831 A.2d 973, 984 (D.C. 2003). The record "clearly and repeatedly demonstrates that the [magistrate judge]

was alert to the possibility of prejudice and acted appropriately." *Id.* at 984. Although adoption petitioners' counsel asked several leading questions, the record shows that the magistrate judge often sustained J.B.'s objections or cautioned counsel to avoid leading questions even without prompting from J.B.'s attorney.

## IV.    Conclusion

For the foregoing reasons, we affirm.

*So ordered.*